UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

LAND O' LAKES, INC.,                            Case No. 09-CV-0693 (PJS/TNL)

             Plaintiff,

v.

EMPLOYERS MUTUAL LIABILITY
INSURANCE COMPANY OF WISCONSIN
and THE TRAVELERS INDEMNITY
COMPANY,

             Defendants.
                                                ORDER GRANTING SUMMARY
_____          JUDGMENT TO DEFENDANTS AND
                                                THIRD-PARTY DEFENDANT
EMPLOYERS INSURANCE COMPANY
OF WAUSAU, f/k/a Employers Insurance of
Wausau a Mutual Company, and THE
TRAVELERS INDEMNITY COMPANY,

             Third-Party Plaintiffs,

v.

WHITE MOUNTAINS REINSURANCE
COMPANY OF AMERICA, successor to
Mutual Service Casualty Insurance Company,
and DOE INSURER DEFENDANTS 1-10,

             Third-Party Defendants.

Steven P. Zabel, LEONARD, STREET AND DEINARD, for plaintiff Land O' Lakes,
Inc.

David C. Linder and Hilary J. Loynes, LARSON KING, LLP, for defendant/third-party
plaintiff Employers Insurance Company of Wausau.

Charles E. Spevacek, Michael P. McNamee, and Katrina M. Giedt, MEAGHER &
GEER, P.L.L.P., for defendant/third-party plaintiff The Travelers Indemnity Company.

Jeanne H. Unger and Shanda K. Pearson, BASSFORD REMELE, PA, for third-party
defendant White Mountains Reinsurance Company of America.

Plaintiff Land O' Lakes has sued two of its insurers — defendants Employers Insurance Company of Wausau ("Wausau")[1] and The Travelers Indemnity Company ("Travelers") — seeking payment of defense costs and indemnity in connection with an environmental-cleanup action brought against Land O' Lakes by the Environmental Protection Agency ("EPA"). Wausau and Travelers have brought third-party claims against White Mountains Reinsurance Company of America ("White Mountains"), which provided insurance coverage that might apply to the EPA action against Land O' Lakes.

Three summary-judgment motions and a related discovery motion are before the Court. Land O' Lakes moves for summary judgment that Wausau and Travelers ("the insurers") must pay Land O' Lakes' past and future defense costs and must indemnify Land O' Lakes for a yet-to-be-determined amount of environmental-cleanup costs. The insurers move for summary judgment that they are liable for nothing. And White Mountains moves for summary judgment that, if the insurers are required to pay Land O' Lakes' defense or indemnity costs, the insurers cannot seek contribution from White Mountains. In addition, Land O' Lakes moves for leave to supplement the summary-judgment record to include a recent letter from the EPA that Land O' Lakes contends is relevant to the pending motions.

This case is extraordinarily complex — it involves multiple insurance policies issued by multiple companies over multiple years — and the parties' summary-judgment motions raise a host of difficult issues under both Minnesota and Oklahoma law.[2] The Court attempts to address

[1]Wausau was named in the complaint as "Employers Mutual Liability Insurance Company of Wisconsin."

[2]The Court commends the attorneys for all of the parties for working together to
(continued...)

most of those issues below.  Although the Court does not agree with all of the insurers'

arguments, the Court ultimately concludes that the insurers are not obligated to defend or

indemnify Land O' Lakes.  Likewise, while the Court does not agree with all of White

Mountains' arguments, the Court ultimately concludes that White Mountains is entitled to

summary judgment on the insurers' contribution claims.[3]  The Court therefore grants the

summary-judgment motions of the insurers (Wausau and Travelers), grants the summary-

judgment motion of White Mountains, denies the summary-judgment motion of Land O' Lakes,

and denies the motion of Land O' Lakes to supplement the summary-judgment record.

## I.  BACKGROUND[4]

Land O' Lakes is a large member-owned agricultural cooperative.  In 1981, Land O'

Lakes agreed to acquire Midland Cooperatives, Inc. ("Midland").  Pursuant to that agreement,

Land O' Lakes and Midland merged on January 1, 1982.  Insurers' Joint Appendix ("JA")

Ex. 47.[5]

---

[2](...continued)
coordinate and simplify the briefing of the pending motions.  Throughout this long and complex
proceeding, the attorneys have been zealous in advocating on behalf of their clients, but also civil
to each other and respectful of the time of the Court.

[3]In their third-party complaints, the insurers named ten "Doe" insurers as third-party
defendants in addition to naming White Mountains.  The insurers have not given any indication
that they intend to name any specific insurance companies as third-party defendants in place of
the Doe insurers.  Accordingly, the Court's dismissal of the insurers' claims against White
Mountains disposes of all of the insurers' genuine claims, and the Court therefore dismisses the
insurers' third-party complaints in their entirety.

[4]Except as noted, the facts are undisputed.

[5]Exhibits in the insurers' joint appendix are cited in this order as "JA Ex. __."  An index
to the joint appendix, as well as the first four exhibits in the joint appendix, are in the record as
(continued...)

Midland began operating an oil refinery in Cushing, Oklahoma in 1943.[6]  Previously, the refinery had been operated by various owners since the early 1900s.  After operating the refinery for roughly 34 years, Midland sold the refinery in 1977 to the Hudson Oil Refinery Company ("Hudson").  Thus, when Land O' Lakes acquired Midland, Midland had not operated the Cushing refinery for about five years.

Midland's successor, Hudson, abandoned the Cushing refinery in 1982 and went bankrupt two years later.  Soon thereafter, the EPA took enforcement action against Hudson, and Hudson agreed to clean up the refinery site.  Hudson ran out of money for cleanup operations after about ten years, and a federal court released Hudson from any further cleanup obligations in 1994.  In the meantime, sometime in the early 1990s, a contractor may have undertaken salvage operations at the refinery site that further damaged the environment.  JA Ex. 22 at LOL0181302.

Throughout the 1990s, the Oklahoma Department of Environmental Quality ("ODEQ") monitored the Cushing refinery site.  The refinery site takes up roughly 200 acres.  A state highway runs through the site, dividing it into a 165-acre portion known as the "North Refinery" and a 35-acre portion known as the "South Refinery."

In 1998, a joint inspection of the Cushing refinery site by the EPA and the ODEQ revealed deteriorated, leaking structures and equipment — including asbestos-containing

---

[5](...continued)
docket number 174.  Affidavits regarding the source of the documents in the joint appendix are in the record as docket numbers 167 and 168.  The remaining documents that make up the joint appendix are in the record as docket numbers 199 to 211.

[6]Facts about the refinery's history come from the EPA's "Record of Decision" ("ROD"), which is found in the record as JA Ex. 8.

-4-

material — and in late 1998 EPA contractors began an emergency removal action to address

immediate threats to human health and the environment.

The EPA placed the Cushing refinery site on the "National Priorities List" or "NPL" in

July 1999 — that is, the EPA designated the refinery as a "Superfund" site.  The Superfund is a

federal fund for cleaning up abandoned hazardous-waste sites.  The Superfund was established

by the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42

U.S.C. §§ 9601-75 ("CERCLA").[7]

Two years later, in 2001, the EPA began removing additional material from the Cushing

refinery site.  This second removal action, which continued into 2003, was a so-called "non-time-

critical" removal action (as distinct from the earlier "emergency" removal action).  Most of the

structures and equipment that Hudson had left behind were removed from the site as part of this

removal action.

In January 2001 — at around the time that the EPA began the non-time-critical removal

action — the EPA sent Land O' Lakes a "Special Notice Letter" about the Cushing refinery site.

JA Ex. 17.  The letter informed Land O' Lakes that, based on Midland's past ownership of the

site and Land O' Lakes' later acquisition of Midland, the EPA considered Land O' Lakes a

"Potentially Responsible Party" ("PRP") under CERCLA.  CERCLA provides, in § 9607(a), that

---

[7]The EPA and environmental lawyers typically refer to CERCLA provisions by the
section number of the provision in the bill that Congress passed, not by the section number of the
law as codified in the United States Code.  Thus, for instance, 42 U.S.C. § 9607 is referred to by
the EPA and environmental lawyers as CERCLA § 107.

The Court does not follow this convention.  Instead, the Court refers to provisions of
CERCLA by using the section numbers of the United States Code, and all references in this
opinion to statutory sections are (except as otherwise indicated) to section numbers within
Title 42.

certain parties — PRPs — may be required, under certain circumstances, to pay the costs of cleaning up Superfund sites that they (or their predecessors) previously owned.

In the 2001 "Special Notice Letter" — also known as a "PRP letter" — the EPA asked Land O' Lakes to pay roughly $8.9 million for the costs of the EPA's cleanup actions to that point.  The EPA also informed Land O' Lakes that to determine what additional cleanup work was needed at the site, the EPA planned to conduct a "Remedial Investigation" followed by a "Feasibility Study" — together called an "RI/FS" — of the site.  Then, to actually clean up the site, the RI/FS would be followed by a "Remedial Design" and "Remedial Action" — called an "RD/RA" — that is, the cleanup itself.  The EPA invited Land O' Lakes to "negotiate a settlement . . . to conduct the RI/FS for the Site and fund related EPA and State costs."  JA Ex. 17 at EPAFOIA0010240.

Land O' Lakes responded to the PRP letter in March 2001.  JA Ex. 18.  Land O' Lakes refused to pay the $8.9 million in past costs that the EPA had incurred, and Land O' Lakes also refused "to prepare or pay expenses associated with preparation of" an RI/FS.  JA Ex. 18 at LOL0181345.  Land O' Lakes argued that any hazardous waste at the site was the fault of Hudson, not Midland, and thus Land O' Lakes was not responsible for any cleanup costs.  *Id.* at LOL0181348 ("EPA has not presented credible evidence that hazardous substances were disposed of at the Site during the time that Midland owned the refinery.").

Although Land O' Lakes' response to the 2001 PRP letter denied any liability, Land O' Lakes nevertheless notified Wausau and Travelers of the EPA's claims.  JA Ex. 23 (letter notifying Wausau of claims); JA Ex. 36 (letter from Travelers acknowledging receipt from Land O' Lakes of notice of claims).  Land O' Lakes sought a defense and indemnity under various

Comprehensive General Liability ("CGL") policies issued by Wausau to Midland and by Travelers to Land O' Lakes and to Midland.

After numerous letters back and forth, Wausau declined in November 2001 to defend Land O' Lakes, arguing that the PRP letter was not a covered "suit" under the relevant policies. JA Ex. 29 at WAU-000638. Land O' Lakes protested this decision by letter in January 2002, characterizing Wausau's actions as "a declination of coverage and a breach of [Wausau's] duty to defend." JA Ex. 30 at WAU-000637. Land O' Lakes apparently met with Wausau about the claim sometime after this, *see* JA Ex. 31, but for the next six years, Land O' Lakes did not take any further steps to challenge Wausau's denial of defense and indemnification obligations.

Travelers likewise declined to defend Land O' Lakes. JA Ex. 38. In April 2001, Travelers made two arguments in response to Land O' Lakes' request for coverage. First, Travelers said that certain excess policies that Travelers had issued to Midland would not be in play until $19 million in primary coverage was exhausted, and Land O' Lakes had not shown that the EPA's claims threatened to exhaust that much primary coverage. These excess policies are not at issue in this case.

Second, Travelers said that the primary CGL policies that it had issued to Land O' Lakes could not apply because Travelers had issued the policies before Land O' Lakes acquired Midland. Thus — according to Travelers — the policies could not cover any damages incurred by Midland before Land O' Lakes acquired Midland.[8]  *Id.* at TRV000907. For the next seven

---

[8] The Court rejected this argument with respect to certain policies in an earlier summary-judgment order. Order Nov. 24, 2010 [Docket No. 90]. The Court held that policies issued by Travelers that provided coverage to Land O' Lakes for 1965 through 1970 might cover the EPA's claims against Land O' Lakes. *Id.* at 21.

years, Land O' Lakes did not take any further steps to challenge Travelers' denial of defense and indemnification obligations.

Meanwhile, the EPA continued its cleanup activities without any input from Land O' Lakes.  The EPA completed its second removal action (the "non-time-critical" one) in June 2003.  Then from 2004 to 2007, on behalf of the EPA, the ODEQ studied the Cushing refinery site and completed an RI/FS that described the contamination at the site and proposed ways to finish cleaning up the site.

The EPA selected an approach to cleaning up the Cushing refinery site in November 2007 when it issued a "Record of Decision" ("ROD") for the site.  The ROD outlined the history of the site, assessed the contamination found there, described alternative approaches to remedying the contamination, and proposed a "selected remedy" for "treat[ing] and/or remov[ing] the source materials constituting principal threats at the site."  JA Ex. 8 at LOL0137437.  The ROD estimated that it would cost roughly $9.65 million to implement the selected remedy.  *Id.*

After completing the ROD, the EPA sent Land O' Lakes a PRP letter in February 2008 — the second PRP letter received by Land O' Lakes.  JA Ex. 19.  In the 2008 PRP letter, the EPA invited Land O' Lakes to negotiate over the continued cleanup of the Cushing refinery site.  The EPA also demanded that Land O' Lakes reimburse it for roughly $20.9 million in past response costs.  *Id.* at WAU-000624.  And the EPA included with the letter a draft consent decree together with a draft "Statement of Work" for a "Remedial Design/Remedial Action" ("RD/RA") for implementing the site remedy selected in the ROD.  *See id.* at WAU-000626.

Land O' Lakes informed Wausau and Travelers of the EPA's newest PRP letter and — as Land O' Lakes had in 2001 — asked for a defense and indemnity.  *See* JA Ex. 32 (letter to

Wausau); JA Ex. 40 (letter to Travelers).  The insurers — as they had in 2001 — denied that they had any obligation to defend or indemnify Land O' Lakes.  *See* JA Ex. 33 (letter from Wausau); JA Ex. 42 (letter from Travelers).

Land O' Lakes responded to the EPA — as it had in 2001 — by denying that Midland had caused any of the contamination at the site.  JA Ex. 20.  In a letter to the EPA in May 2008, Land O' Lakes refused to pay the EPA's past response costs and refused to undertake or pay for any future remediation activities.  *Id.* at LOL-INS 0002872.

The EPA was unmoved by Land O' Lakes' arguments for why it was not responsible for cleaning up the Cushing refinery site, and in January 2009, the EPA issued a "Unilateral Administrative Order" ("UAO") directing Land O' Lakes to implement the remedy selected by the EPA in the ROD.  JA Ex. 21.  Specifically, the UAO ordered Land O' Lakes to "perform a remedial design for the remedy described in the Record of Decision" — the RD portion of an RD/RA — and to "implement the design by performing a remedial action" — the RA portion of an RD/RA.  *Id.* at LOL0169729.

Acting promptly, Land O' Lakes informed the EPA in February 2009 that it would comply with the UAO.  JA Ex. 22.  Land O' Lakes took issue with many of the details of the UAO, *see id.*, but nonetheless began undertaking the work called for by the EPA.

Also in February 2009, Land O' Lakes initiated this lawsuit.  Land O' Lakes seeks a money judgment for its defense costs to date and a declaratory judgment that Wausau and Travelers must indemnify Land O' Lakes for its cleanup costs once the amount of those costs is finally established.

After agreeing to comply with the UAO, Land O' Lakes retained two contractors to implement the remedy called for by the EPA:  Benham Companies, LLC performed the remedial design, and Envirocon, Inc. performed the remedial action.  JA Ex. 9 at LOL0379534.  Those companies performed work at the site throughout 2009 and 2010, and in November 2010, the EPA issued a "Preliminary Close Out Report" for the site indicating that the site had been cleaned up in accordance with the ROD, as modified during the course of the work.  JA Ex. 9.[9] The Preliminary Close Out report includes a schedule for "additional pre-final inspections" to take place in the summer and fall of 2011 and for a "five-year review" to take place in February 2015.  Thus, the bulk of the remediation work at the site has already been completed.[10]

The following chronology sums up the key events described above:

- Early 1900s to 1943 — A refinery is operated in Cushing, Oklahoma by various owners.

- 1943 to 1977 — Midland operates the Cushing refinery.

- 1977 to 1984 — Hudson operates the Cushing refinery, abandons it, and goes bankrupt.

- 1982 — Land O' Lakes and Midland merge.

---

[9]Differences between the remedy selected in the ROD and the remedy that was actually implemented are explained in the "Explanation of Significant Differences" ("ESD") for the site issued by the EPA in November 2010 in conjunction with the Preliminary Close Out Report.  JA Ex. 10 (ESD); JA Ex. 9 at LOL0379541-42 (discussion of ESD in Preliminary Close Out Report).

[10]See JA Ex. 9 at LOL0379527 ("On October 19, 2010, the EPA, the Oklahoma Department of Environmental Quality (ODEQ) project manager, and a Land O' Lakes (LOL) representative conducted a Pre-final inspection.  EPA and ODEQ have determined that Land O' Lakes has constructed the remedy in accordance with the Remedial Design (RD) plans and specifications and with the Remedial Action (RA) Work Plan.").

- 1984 to mid-1990s — Hudson, in response to action by the EPA, does some cleanup at the refinery site.  A contractor (perhaps) undertakes salvage actions in the early 1990s that damage the site.

- 1998 — The EPA undertakes an emergency removal action to remedy immediate threats to human health and the environment.

- 1999 — The EPA designates the Cushing refinery site as a Superfund site.

- 2001 — The EPA sends Land O' Lakes a PRP letter asking for $8.9 million in past cleanup costs and for participation in a "Remedial Investigation and Feasibility Study" ("RI/FS") for future cleanup.  Land O' Lakes denies any responsibility, refuses to pay, and refuses to participate in the RI/FS.

- 2001 to 2002 — Land O' Lakes asks Wausau and Travelers to provide a defense and coverage.  Both insurers refuse, and Land O' Lakes lets the matter drop.

- 2001 to 2003 — The EPA conducts a second, non-time-critical removal action to remedy threats to human health and the environment.

- 2004 to 2007 — Oklahoma's environmental agency (the ODEQ) conducts an RI/FS for the EPA.

- November 2007 — The EPA issues its "Record of Decision" ("ROD") selecting a site remedy.

- 2008 — The EPA sends a second PRP letter to Land O' Lakes asking for $20.9 million in past cleanup costs and for participation in a "Remedial Design" and "Remedial Action" ("RD/RA") for cleaning up the site.  Land O' Lakes denies any responsibility, refuses to pay, and refuses to participate in the RD/RA.

- 2008 — Land O' Lakes again asks that Wausau and Travelers provide a defense and coverage.  Both insurers again refuse.

- January 2009 — The EPA issues a Unilateral Administrative Order ("UAO") directing Land O' Lakes to perform an RD/RA for cleaning up the site in accordance with the ROD.

- February 2009 — Land O' Lakes informs the EPA that it will comply with the UAO.  Land O' Lakes sues Wausau and Travelers for a defense and indemnity.

- 2009 and 2010 — Land O' Lakes' contractors, Benham and Envirocon, clean up the Cushing refinery site by performing the RD/RA.

- November 2010 — The EPA issues a Preliminary Close Out Report and Explanation of Significant Differences ("ESD") showing that the Cushing refinery site has been cleaned up in accordance with the ROD, as modified during the course of the work.

- Summer and fall of 2011 — Additional "pre-final inspections" take place at the refinery site.

- February 2015 — Five-year review is scheduled to take place.

## II.  DISCUSSION

In Section A below, the Court sets forth the applicable standard of review and provides an overview of the choice-of-law issues.  Next, in Section B, the Court discusses Land O' Lakes' motion to supplement the summary-judgment record.  The Court then turns, in Sections C through E,  to the parties' substantive claims.  Specifically, Section C addresses Land O' Lakes' claims against Wausau and Travelers for breach of the duty to defend.  Section D addresses Land O' Lakes' claims against Wausau and Travelers for breach of the duty to indemnify.  And Section E addresses White Mountains' claims against Wausau and Travelers for contribution.

### A.  Standard of Review and Applicable Law

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute over a fact is "material" only if its resolution might affect the outcome of the lawsuit under the substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor."  *Id.* at 255.

Because this Court sits in Minnesota, it must apply the choice-of-law rules applied by Minnesota courts.  *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).  In determining which state's law to apply, Minnesota courts consider five factors: (1) predictability of results; (2) maintenance of interstate order; (3) simplification of the judicial task; (4) advancement of the forum's governmental interests; and (5) application of the better rule of law.  *Milkovich v. Saari*, 203 N.W.2d 408, 412 (Minn. 1973); *see also Jepson v. Gen. Cas. Co. of Wis.*, 513 N.W.2d 467, 470 (Minn. 1994).

The laws of two states potentially apply in this case: Minnesota, where Land O' Lakes is and Midland was headquartered, and Oklahoma, the location of the Cushing refinery.

The parties seem to agree that Minnesota law applies to most issues related to the Travelers policies, which were issued to Land O' Lakes in Minnesota before Land O' Lakes acquired the Cushing refinery.  The parties also seem to agree that Oklahoma law — if it differs from Minnesota law — applies to most issues related to the Wausau policies, which were issued specifically to cover operations at the Cushing refinery.  The Court has no reason to question the parties' areas of agreement.  *See Nat'l Union Fire Ins. Co. of Pittsburgh v. Terra Indus., Inc.*, 346 F.3d 1160, 1164 (8th Cir. 2003) ("State law governs the interpretation of insurance policies.").

Minnesota and Oklahoma law differ, either actually or potentially, with respect to four issues: (1) what constitutes a "suit" under a CGL policy; (2) what qualifies as "property" owned by an insured; (3) what qualifies as an "accident" under a CGL policy; and (4) whether an insurer's breach of the duty to defend precludes the insurer from seeking contribution from

another insurer.  The Court addresses choice-of-law questions related to these issues in context below as the discussion requires.

### B.  Untimely Record Evidence

Before turning to the merits of the parties' arguments, the Court addresses Land O' Lakes' motion to supplement the summary-judgment record.

Under the governing scheduling order, expert discovery closed on August 15, 2011. Sixth Am. Pretrial Sched. Order at 3 [Docket No. 97].  Fact discovery closed on April 1, 2011, with one exception:  The parties were permitted to conduct "EPA follow-up discovery" until, at the latest, August 15, 2011.[11]  Further, the governing scheduling order includes the following provision:

> The parties agree that no additional request for a modification of the scheduling order will be made in the future based upon, arising out of, connected to, or in any way involving the additional groundwater monitoring or anything else contained in the ESD [i.e., the EPA's Explanation of Significant Differences].

*Id.* at 5.

Even though the governing scheduling order explicitly forbids any party to request an extension related to "anything . . . in the ESD" — a provision that Land O' Lakes apparently requested[12] — Land O' Lakes nevertheless moves to supplement the summary-judgment record

---

[11]Sixth Am. Pretrial Sched. Order at 3 ("All fact discovery of any kind shall be commenced in time to be completed by [April 1, 2011], except that any EPA follow-up discovery shall be completed within 60 days of receipt of the sampling results of the additional wells installed by the EPA, or [by] August 15, 2011, whichever is earlier.").

[12]Linder Decl. Ex. B at 3 [Docket No. 237] (April 1, 2011 email from Land O' Lakes' counsel saying that Land O' Lakes will agree to extend the scheduling order "only . . . on the condition that the Insurers stipulate that no additional request for a continuance will be made in

(continued...)

to include a letter from the EPA dated October 29, 2011.  The letter directs Land O' Lakes to

modify a draft "Supplemental Remedial Action Work Plan" to "include coordination with the

Oklahoma Department of Transportation (ODOT) to address former refinery coke tar waste

material and coke tar contaminated soils that may extend north beyond the north fence-line of the

South Refinery."  Suppl. Zabel Aff. Ex. A at LOL0386000-01 [Docket No. 233].  The EPA

apparently discovered coke-tar waste on property currently owned by ODOT during excavations

conducted on October 25 and 26, 2011.  *Id.* at LOL0386002.

Land O' Lakes' motion is, in effect, a motion under Fed. R. Civ. P. 16(b)(4) and D. Minn.

LR 16.3(a) to modify the scheduling order by extending the fact-discovery deadline.  Such a

motion must be supported by "good cause."

The only "cause" offered by Land O' Lakes to support its motion is, in effect, that the

EPA's letter is helpful to its case and contains new information.  This does not qualify as "good

cause" for modifying the scheduling order.

In every case — and particularly in every case involving an ongoing environmental

cleanup — evidence that one side or the other finds helpful might come to light after the close of

discovery.  But for courts to adjudicate cases with some semblance of efficiency, the record

cannot be an ever-moving target.  At some point, the record must hold still, and a court must be

able to decide the case based on the record before it.

In this case, after receiving hundreds of pages of briefs and thousands of pages of

exhibits, the Court devoted an entire day to hearing argument on the parties' summary-judgment

---

[12](...continued)
the future 'based upon, arising out of, connected to, or in any way involving' the additional
groundwater monitoring or anything else contained in the ESD.").

motions.  The parties' arguments were based on the record as it then existed, and the Court

devoted several days to preparing for the hearing.  The parties are entitled to receive — and the

Court is entitled to make — a decision that is based on the record as it existed at the time of the

summary-judgment hearing.

Further, Land O' Lakes' motion to supplement the record contravenes the scheduling

order's prohibition on requests to extend the discovery schedule, as Wausau and Travelers argue

in opposing the motion.  *See* Insurers' Resp. Pl. Mot. Supplement at 3-5 [Docket No. 236].  In its

reply memorandum, Land O' Lakes does not even try to respond to this argument, thereby tacitly

acknowledging that no reasonable counterargument is possible.  *See* Pl. Reply Mem. Supp. Mot.

Supplement [Docket No. 239].

Finally, even if the Court considered the EPA's letter as evidence of the possible

existence of coke-tar residue in property owned by ODOT, nothing in this order would change.

For one thing, it appears that the contaminated property was owned by Midland at the time that it

was contaminated, and the property would therefore likely be excluded from coverage under the

insurers' policies despite having later been sold.  All of the policies at issue include some

variation of an "owned-property" exclusion, which excludes coverage both for injury to property

"owned" by the insured and for injury to "premises alienated by" the insured.  *See* JA Ex. 4 (table

of owned-property exclusions excerpted from the policies).[13]

---

[13]*See also Morrone v. Harleysville Mut. Ins. Co.*, 662 A.2d 562, 565 (N.J. Super. Ct. App. Div. 1995) ("[The insured] cannot claim that the damage was triggered during the terms of the policies and yet avoid the corresponding [owned-property] exclusion simply because a claim for damages arising therefrom was not made until after she was able to sell the property."); *cf. Domtar, Inc. v. Niagara Fire Ins. Co.*, 563 N.W.2d 724, 734 (Minn. 1997) (holding that an owned-property exclusion did not apply with respect to property that the insured bought only

(continued...)

For another, even if ODOT's contaminated property were not within the owned-property exclusion, this would not create coverage for Land O' Lakes' cleanup costs because, at least so far, all of those costs have been spent cleaning up Land O' Lakes' property.  Thus, as explained more fully below in connection with the owned-property exclusion, because there is no causal connection between the contamination (if any exists) of ODOT's property and the damages for which Land O' Lakes now seeks indemnification, the contamination of ODOT's property is irrelevant to the availability of coverage under the insurers' policies.

### C.  Duty to Defend — Wausau and Travelers

All of the CGL policies at issue in this litigation obligate the insurers to defend a "suit" for "damages on account [of]" injury to property (among other things).[14]  Under Minnesota law, an insurer's duty to defend "extends to every claim that 'arguably' falls within the scope of coverage . . . ."  *Wooddale Builders, Inc. v. Md. Cas. Co.*, 722 N.W.2d 283, 302 (Minn. 2006). Further, "the duty to defend one claim creates a duty to defend all claims," and the duty exists "regardless of the merits of the underlying claims."  *Id.*  The duty to defend is thus broader than the duty to indemnify, which extends only to actually covered claims, not to claims that are merely arguably covered.  *See id.*

---

[13](...continued)
after the policy periods for which the insured sought coverage).

[14]A representative insuring clause provides in relevant part that the insurer

> shall . . . defend any suit against the insured alleging [injury to or destruction of property caused by an accident] and seeking damages on account thereof, even if such suit is groundless, false or fraudulent . . . .

JA Ex. 6 at TRV000051.  Excerpts from the various insuring clauses of each policy at issue are summarized in a table in Exhibit 3 to the insurers' joint appendix.

There is no question that the insurers have refused to defend Land O' Lakes, so if any duty to defend existed, the insurers have breached it.  The question, therefore, is whether — and if so, when — the insurers' duty to defend was triggered by the EPA's enforcement action against Land O' Lakes.  If the duty was triggered in 2001 — when the EPA first contacted Land O' Lakes — then the six-year statute of limitations on Land O' Lakes' duty-to-defend claims has run.  *See* Minn. Stat. § 541.05, subd. 1(1) (establishing a six-year limitations period for contract actions); *St. Paul Fire & Marine Ins. Co. v. A.P.I., Inc.*, 738 N.W.2d 401, 408-09 (Minn. Ct. App. 2007) (applying § 541.05 in an insurance-coverage action).

The question of whether the insurers' duty to defend has been triggered can be broken down further into two distinct questions:  First, has Land O' Lakes at any time faced a "suit" in connection with the EPA's enforcement action?  Second, if Land O' Lakes has faced a "suit" in connection with the EPA's enforcement action, did that suit seek damages that are arguably covered under the policies at issue?

According to Land O' Lakes, both of the PRP letters from the EPA — the 2001 letter and the 2008 letter — amounted to "suits."  But, says Land O' Lakes, the 2001 PRP letter was not a suit for arguably covered damages, and thus that letter did not trigger the insurers' duty to defend.  Instead, according to Land O' Lakes, the insurers' duty to defend was not triggered until the EPA sent the 2008 PRP letter because that letter sought different damages — damages that *were* arguably covered — than the 2001 PRP letter.  Thus, as Land O' Lakes would have it, the insurers' duty to defend first arose in 2008, the insurers breached that duty, and the statute of limitations has not run on Land O' Lakes' duty-to-defend claims.

-18-

Wausau and Travelers both argue (on somewhat different grounds) that a duty to defend has never arisen.  In the alternative, they argue that if a duty to defend arose, it arose in 2001, the insurers breached the duty at that time, and therefore Land O' Lakes' duty-to-defend claims are barred by the statute of limitations.

In arguing that a duty to defend has never arisen, Wausau and Travelers take different positions on whether a PRP letter qualifies as a "suit."  Wausau argues that a PRP letter is not a "suit" under Oklahoma law, and thus denies that a PRP letter can trigger its duty to defend.  In the alternative, Wausau contends that if a PRP letter is a "suit," neither the 2001 PRP letter nor the 2008 PRP letter triggered its duty to defend because neither letter sought arguably covered damages.  For its part, Travelers accepts that, under Minnesota law, a PRP letter is a "suit," but Travelers argues (along with Wausau) that it has no duty to defend the PRP letters because the letters do not seek arguably covered damages.

Alternatively, Wausau and Travelers contend that if the Court finds — contrary to their arguments — that the 2008 PRP letter was a suit for arguably covered damages, then the 2001 PRP letter was *also* a suit for arguably covered damages, and the statute of limitations therefore bars Land O' Lakes' duty-to-defend claims.  In other words, although Wausau and Travelers deny having ever breached the duty to defend, they say that if they did breach the duty, they breached it in 2001, more than six years before Land O' Lakes brought this lawsuit.

Land O' Lakes tries to shoot the gap between the insurers' alternative arguments.  As noted, Land O' Lakes argues that the 2001 and 2008 PRP letters were both "suits," but only the 2008 letter was a suit for arguably covered damages.  Under this theory, the insurers first breached their duty to defend in 2008.  Alternatively, Land O' Lakes says that if the PRP letters

were not "suits," then the EPA's 2009 order — the UAO — was a "suit," and Wausau and Travelers breached their duty to defend by refusing to defend the UAO.  Either way, says Land O' Lakes, Wausau and Travelers did not breach the duty to defend in 2001.

The Court finds, based on the undisputed facts, that the insurers breached their duty to defend in 2001, and that Land O' Lakes' claim for breach of the duty to defend is therefore barred by the statute of limitations.  Below, the Court first explains why the 2001 PRP letter was a "suit."  The Court then explains why the 2001 PRP letter sought "arguably covered damages."  And finally the Court briefly addresses additional arguments related to Land O' Lakes' duty-to-defend claim.

### 1.  Why a PRP Letter Is a "Suit"

A PRP letter is not a polite invitation from the EPA to engage in conversation.  It is an official agency action that has legal consequences, and a recipient ignores a PRP letter at its peril.  If a recipient fails to respond to a PRP letter, the EPA

> will take one of several steps: (1) seek an injunction . . . forcing the PRP to act; (2) issue an administrative order pursuant to . . . CERCLA, either demanding information or forcing PRP cleanup; or (3) send additional notice letters, known colloquially as "drop dead" letters, informing the PRPs that they must follow the EPA's suggested cleanup "voluntarily," otherwise, the government will expurgate the pollution itself, and thereafter demand reimbursement through a CERCLA § 107 [42 U.S.C. § 9607] cost recovery action. . . . Whether the EPA attempts to compel cleanup or seeks reimbursement, once the agency notifies a party of its potential liability, the PRP is faced with three alternatives: (1) engage in a voluntary settlement; (2) force the government to order cleanup; or (3) have the government unilaterally implement cleanup and litigate for reimbursement later.

Mark S. Dennison, Annotation, *What Constitutes "Suit" Triggering Insurer's Duty to Defend Environmental Claims — State Cases*, 48 A.L.R.5th 355 § 2[a] (2011) (footnotes omitted).

Accordingly, a recipient has "no practical choice other than to respond actively to [a PRP] letter.'' *Hazen Paper Co. v. U.S. Fid. & Guar. Co.*, 555 N.E.2d 576, 582 (Mass. 1990).

Numerous courts have been asked to decide whether a PRP letter is a "suit" as that term is used in CGL policies, and the vast majority of those courts have held that it is. Because of the serious consequences of a PRP letter and its critical role in the process of enforcing environmental laws, "a huge majority of U.S. courts hold that a policyholder's receipt of a PRP notice from the U.S. EPA, or a state or local environmental agency, is the 'functional equivalent' of a 'suit.'" 2 Tod Zuckerman & Mark Raskoff, *Environmental Insurance Litigation: Law and Practice* § 12:33 (2011). In other words, "[a]lthough courts are divided on this issue, the very strong majority view is that a policyholder's receipt of a PRP letter imposes a duty to defend on the insurer." *Id.* § 12:34.

Minnesota adopted the majority view in *SCSC Corp. v. Allied Mutual Insurance Co.*, holding that "the term 'suit,' as used in a CGL policy," includes a state environmental agency's action that was analogous to a PRP letter from the EPA. 536 N.W.2d 305, 315 (Minn. 1995), *overruled on other grounds by Bahr v. Boise Cascade Corp.*, 766 N.W.2d 910, 919 (Minn. 2009). In light of *SCSC*, Travelers does not deny that the 2001 and 2008 PRP letters satisfied the "suit" requirement of the Travelers policies.

Wausau, however, argues that under Oklahoma law, a PRP letter is not a "suit" for purposes of its CGL policies. Land O' Lakes seems to concede that if Minnesota law and Oklahoma law are in conflict over whether a PRP letter is a "suit," Oklahoma law would govern

this question.[15]  Because the Oklahoma Supreme Court has not yet decided whether a PRP letter

is a "suit," the Court must predict how that court would decide the question.  *See Integrity*

*Floorcovering, Inc. v. Broan-Nutone, LLC*, 521 F.3d 914, 917 (8th Cir. 2008).

In support of its contention that, under Oklahoma law, a "suit" does not include a PRP

letter, Wausau makes three arguments.  First, Wausau appeals to the definition of "suit" found in

*Black's Law Dictionary*.  Wausau Suppl. Mem. Supp. Mot. SJ at 9 [Docket No. 166].  Second,

Wausau points out that some policy language requires Wausau to defend "'any *suit* against the

insured'" but other language allows Wausau to "'make such investigation and settlement of any

*claim* or *suit* as it deems expedient.'"  *Id.* (quoting policy language; emphasis in Wausau's

memorandum).  According to Wausau, a PRP letter from the EPA amounts to a "claim," not a

"suit," as those two terms are used in the policies at issue.  Third, Wausau says that because

Oklahoma case law refers to "'pleadings'" in describing the scope of the duty to defend, the duty

could only arise in response to a lawsuit, and not in response to something like a PRP letter.  *Id.*

at 10 (quoting *First Bank of Turley v. Fid. & Deposit Ins. Co. of Md.*, 928 P.2d 298, 303-04

(Okla. 1996)).

Insurers have regularly made these and similar arguments with respect to PRP letters, and

the overwhelming majority of courts have just as regularly rejected these arguments.[16]  Notably,

---

[15]*See* Pl. Mem. Opp. Wausau Mot. SJ at 3 [Docket No. 213] ("[I]f this court were to hold
that there is an actual conflict of law in this case, then existing Oklahoma law makes it clear that
the Oklahoma Supreme Court would adopt the rule recognized by the 'vast majority' of courts in
this country and conclude that the reasonable expectations of the insured require that a PRP letter
be deemed to be the functional equivalent of a 'suit' for the purpose of triggering the duty to
defend under a CGL policy of insurance.").

[16]*Dutton-Lainson Co. v. Cont'l Ins. Co.*, 778 N.W.2d 433, 449 (Neb. 2010) ("Whether an
(continued...)

as support for its arguments, Wausau relies on opinions from California and Illinois — two of the

three states that have adopted the minority position that a PRP letter is not a suit.[17]

The Court finds that the Oklahoma Supreme Court would likely adopt the majority view

and hold that a PRP letter is a "suit" for purposes of a CGL policy.  To begin with, Wausau's

_____

[16](...continued)
insurer is required to provide coverage on a policy should not be dependent on whether the EPA
proceeds with administrative remedies or files litigation.  A PRP letter is the functional
equivalent of a 'suit' as described in the insurance policies, and therefore, the insurers had a duty
to defend [the insured]."); *R.T. Vanderbilt Co. v. Cont'l Cas. Co.*, 870 A.2d 1048, 1063 (Conn.
2005) ("[A] PRP letter issued by the EPA will *always* constitute a suit within the meaning of
standard comprehensive general liability insurance policy language." (emphasis in original));
*Johnson Controls, Inc. v. Emp'rs Ins. of Wausau*, 665 N.W.2d 257, 264 (Wis. 2003) ("[R]eceipt
of a potentially responsible party (PRP) letter from the EPA or an equivalent state agency, in the
CERCLA context, marks the beginning of adversarial administrative legal proceedings that seek
to impose liability upon an insured. . . . Therefore, a reasonable insured would expect this letter
to trigger its CGL insurer's duty to defend." (footnote omitted)); *Compass Ins. Co. v. City of
Littleton*, 984 P.2d 606, 622 (Colo. 1999) ("[T]he term 'suit' is ambiguous, and . . . an EPA
action under CERCLA is sufficiently coercive to constitute a 'suit' as that term is used in the
insurance policies."); *SCSC Corp. v. Allied Mut. Ins. Co.*, 536 N.W.2d 305, 315 (Minn. 1995),
*overruled on other grounds by Bahr v. Boise Cascade Corp.*, 766 N.W.2d 910, 919 (Minn.
2009); *Mich. Millers Mut. Ins. Co. v. Bronson Plating Co.*, 519 N.W.2d 864, 870-71 (Mich.
1994), *overruled on other grounds by Wilkie v. Auto-Owners Ins. Co.*, 664 N.W.2d 776 (Mich.
2003); *Coakley v. Me. Bonding & Cas. Co.*, 618 A.2d 777, 786 (N.H. 1992); *A.Y. McDonald
Indus., Inc. v. Ins. Co. of N. Am.*, 475 N.W.2d 607, 628-29 (Iowa 1991); *Hazen Paper Co. v. U.S.
Fid. & Guar. Co.*, 555 N.E.2d 576, 581 (Mass. 1990) ("The consequences of the receipt of the
EPA [PRP] letter were so substantially equivalent to the commencement of a lawsuit that a duty
to defend arose immediately."); *C.D. Spangler Constr. Co. v. Indus. Crankshaft & Eng'g Co.*,
388 S.E.2d 557, 570 (N.C. 1990); *Aetna Cas. & Sur. Co. v. Pintlar Corp.*, 948 F.2d 1507, 1517
(9th Cir. 1991) (Idaho law); *see also Compass Ins. Co. v. Cravens, Dargan & Co.*, 748 P.2d 724,
728-29 (Wyo. 1988) (CGL policy covered immediate cleanup costs of oil spill, even though no
formal claims were filed).

[17]The three opinions of a state's highest court holding that a "suit" does not include
something like a PRP letter are: (1) *Patrons Oxford Mutual Insurance Co. v. Marois*, 573 A.2d
16, 20 (Me. 1990); (2) *Lapham-Hickey Steel Corp. v. Protection Mutual Insurance Co.*, 655
N.E.2d 842, 847 (Ill. 1995); and (3) *Foster-Gardner, Inc. v. National Union Fire Insurance Co.
of Pittsburgh*, 959 P.2d 265, 286-87 (Cal. 1998).  *See generally* 2 Tod Zuckerman & Mark
Raskoff, *Environmental Insurance Litigation: Law and Practice* § 12:35-12:36 (2011).

appeal to *Black's Law Dictionary* fails because other dictionaries define "suit" more broadly. *See, e.g., R.T. Vanderbilt Co. v. Cont'l Cas. Co.*, 870 A.2d 1048, 1059 (Conn. 2005) ("Several dictionaries also contain a broader definition [of suit] that includes an 'attempt to recover a right or claim through legal action.'" (quoting *Webster's New Twentieth Century Dictionary of the English Language* (2d ed. 1964))).  The term "suit" is therefore broad enough to create a reasonable expectation on the policyholder's part that a PRP letter is a suit for purposes of a CGL policy.  *See id.* at 1059-60.

The Oklahoma Supreme Court's use of the word "pleadings" in connection with the duty to defend does not appreciably narrow the meaning of the word "suit."  The passage from *First Bank of Turley v. Fidelity & Deposit Insurance Co. of Maryland* on which Wausau relies says that the duty to defend "is determined on the basis of information gleaned from the petition (and other pleadings), from the insured and from *other sources* available to the insurer at the time the defense is demanded . . . ."  928 P.2d 298, 303-04 (Okla. 1996) (emphasis added; footnotes omitted).  In context, *First Bank of Turley*'s reference to "pleadings" — which appears alongside a reference to "other sources" of information — does not dictate that the word "suit" in a CGL policy excludes a PRP letter.

Wausau's best argument is that a "suit" must be a formal lawsuit because the policy language distinguishes a "suit" from a "claim."  At most, however, this renders the word "suit" ambiguous.  And under Oklahoma law, if an insurance policy is ambiguous, the policy must be interpreted to be consistent with the reasonable expectations of the insured — even if those expectations conflict with the policy language.  *See Max True Plastering Co. v. U.S. Fid. & Guar. Co.*, 912 P.2d 861, 863 (Okla. 1996).  In other words, if an insurance policy "creates in the

-24-

insured a reasonable expectation of coverage which is not supported by policy language, the expectation will prevail over the language of the policy." *First Bank of Turley*, 928 P.2d at 303 n.12.  Given the nature of a PRP letter, the Court predicts that the Oklahoma Supreme Court will hold — as most other courts have held — that because an insured can reasonably expect its insurer to treat a PRP letter as a "suit," an insurer must treat a PRP letter as a "suit" for purposes of a CGL policy.

2.   Why Both PRP Letters Sought "Arguably Covered Damages"

In the 2001 PRP letter, the EPA informed Land O' Lakes "of the potential liability of Land O'Lakes under CERCLA Section 107(a) [42 U.S.C. § 9607(a)]" with respect to the Cushing refinery.  JA Ex. 17 at EPAFOIA0010239.  The EPA invited Land O'Lakes to negotiate about conducting a "Remedial Investigation and Feasibility Study" or "RI/FS" of the site.  *Id.* The purpose of the RI/FS was "to determine the full nature and extent of contamination at the [Cushing refinery], the risk it poses to human health and the environment, and the development of alternatives for long-term cleanup of the [Cushing refinery]."  *Id.*  In addition, the EPA asked Land O' Lakes to reimburse it for roughly $8.9 million that the EPA had previously spent in cleaning up the site.  *Id.* at EPAFOIA0010242.

The $8.9 million in cleanup costs related to the "emergency" and "non-time-critical" removal actions undertaken by the EPA.  The EPA undertook the emergency removal action in 1998; the non-time-critical removal action was ongoing as of the 2001 PRP letter.  *Id.* at EPAFOIA0010250.

Land O' Lakes takes the position in this suit — a position unchallenged by the insurers — that the removal-action costs relate only to the abandonment of the refinery by Hudson

(Midland's successor) and subsequent salvage activities, not to the period when Midland owned the refinery.  Pl. Mem. Opp. Joint Mot. SJ at 20 [Docket No. 214]; Insurers' Joint Reply Mem. Supp. Mot. SJ at 3 [Docket No. 223].  Thus, says Land O' Lakes, claims related to the January 2001 PRP letter were not even arguably covered under the policies at issue in this suit because that letter did not "tie[] the damages sought by the EPA . . . to actual injury to third-party property . . . during the period of Midland's ownership."  Pl. Mem. Opp. Joint Mot. SJ at 20-21. In other words, Land O' Lakes argues that it was not even *arguably* liable for the damages sought by the EPA in the 2001 PRP letter for two reasons: (1) the injury to property that gave rise to the damages was caused by Hudson, not Midland, and (2) the injury was to the Cushing refinery site alone, not to third-party property, and therefore was excluded from coverage in light of the owned-property exclusion in every policy at issue.  *See* JA Ex. 4 (table of owned-property exclusions excerpted from the policies).

The Court will assume, for the sake of argument, that Land O' Lakes and the insurers are correct in asserting that the $8.9 million in removal costs sought by the EPA in the 2001 PRP letter was not for arguably covered damages.  But in that letter, the EPA went far beyond seeking reimbursement for those removal costs.  The EPA also asked Land O' Lakes to participate in conducting an RI/FS.  In addition, the EPA informed Land O' Lakes of the EPA's plans (after completing the RI/FS) to conduct "Remedial Design and Remedial Action (RD/RA) to design and implement the remedial action selected and approved by the EPA for the [Cushing refinery]," followed by "[f]ollow-up activities to monitor, operate, and maintain the completed remedial action as required at the [Cushing refinery] after the remedial action is complete."  JA Ex. 17 at EPAFOIA0010242-43.

In short, the 2001 PRP letter makes abundantly clear that, as of that time, the "full nature and extent" of contamination at the Cushing refinery — and thus Land O' Lakes' potential liability for that contamination — was unknown.  *Id.* at EPAFOIA0010239.  Thus, even without further information, a reasonable person would have expected in 2001 that an RI/FS of the Cushing refinery might reveal injury to third-party property that would arguably be covered by the insurance policies at issue in this suit.

As it happens, however, the 2001 PRP letter *did* include further information showing that the EPA was seeking arguably covered damages from Land O' Lakes when it asked the company to participate in preparing the RI/FS — a process likely to cost many thousands or even millions of dollars.  Specifically, the draft "Administrative Order on Consent" ("AOC") that accompanied the PRP letter included the following "findings of fact" related to injury to third-party property:

> 10.  The Site is an inactive refinery in a suburban area that includes residential and commercial properties.  In particular, eleven residences are within 200 feet of the Site, and a Head Start day care facility is within one quarter of a mile of the Site. . . . Runoff from the Site enters Skull Creek, a perennial stream that is a tributary of the Cimarron River. . . .
>
> 15. . . . EPA reviewed the [Oklahoma Department of Environmental Quality's] file associated with the Site.  This file review . . . raised several concerns to be addressed by EPA: (1) surface and subsurface soil contamination; (2) ground water contamination; (3) surface water and surface runoff into navigable waters; (4) [asbestos-containing material]; and[] (5) transformers and [above-ground storage tanks]. . . .
>
> 18.  EPA has observed separators and aboveground storage tanks (ASTs) on site overflowing, as well as visibly stained soils in various locations.  There is a remaining threat of release of hazardous substances from tanks, tank bottoms, drums and separators. . . . Oily sheens have been seen entering runoff to wetlands on site as well as drainage ditches, which eventually enter Skull Creek. . . .

23.  A 1963 aerial photograph of the Site . . . shows releases or threatened releases including the following:

    (a)    a breach in a berm . . . with apparent leakage toward Skull Creek; . . .

    (e)     . . . two breaches in the revetment around Tank Farm 3, with a dark material leaking into a northward-flowing drainage ditch . . . ;

    (f)     . . . two breaches in the lagoon to the north of Tank Farm 1, with leakage toward Skull Creek.

24.  A 1969 aerial photograph of the Site . . . shows releases or threatened releases including . . . a spill emanating from three vertical tanks east of Tank Farm 4, flowing toward Skull Creek . . . .

26.  In July 1970, rain caused Skull Creek to overflow into the Cimarron River, and separating tanks and oil traps belonging to Midland . . . overran . . . resulting in a fish kill in the Cimarron River. . . .

32.  The disposal of hazardous substances at the Site occurred during the operation of the Site under Midland's ownership. Midland's operations . . . have caused the release of hazardous substances into air, soil, surface water, and ground water at the Site. . . .

35.  The presence of hazardous substances at the Site, and the past, present or potential movement of hazardous substances at or emanating from the Site, constitute actual and threatened "releases" as defined in . . . 42 U.S.C. § 9601(22).

JA Ex. 17 at EPAFOIA0010249-56.

As these excerpts show, the EPA alleged in 2001 that Skull Creek had, in the past, been contaminated by waste from the Cushing refinery.  The EPA also alleged past contamination of the "air, soil, surface water, and ground water" at the refinery site.  *Id.* at EPAFOIA0010256. And the EPA cited the "potential movement of hazardous substances at or emanating from the

-28-

Site . . . ." *Id.*  In other words, the EPA alleged that the Cushing refinery had already caused

harm to third-party property and threatened to cause additional harm to third-party property.

These facts alleged by the EPA in 2001 about harm to third-party property are essentially

indistinguishable from the facts that, according to Land O' Lakes, support summary judgment in

favor of Land O' Lakes in this action.  Specifically, Land O' Lakes argues that because the EPA

alleges injury to groundwater, to Skull Creek and the Cimarron River, and to the general

environment, coverage is available despite the owned-property exclusion in the CGL policies at

issue.  Pl. Mem. Supp. Mot. SJ at 2-5 [Docket No. 105]; Pl. Mem. Opp. Joint Mot. SJ at 10-16.

The Court disagrees with Land O' Lakes' interpretation of the owned-property exclusion, as the

Court will explain below.  For present purposes, though, what matters is that *every one* of these

items of damage — items of damage that, according to Land O' Lakes, are so clearly covered by

its policies that it is now entitled to summary judgment — were identified by the EPA in 2001 in

the draft AOC that accompanied the PRP letter.

Land O' Lakes attempts to sidestep the contents of the 2001 draft AOC by focusing on

later documents (such as the 2007 ROD) in identifying the damages for which Land O' Lakes

now seeks coverage.  For instance, Land O' Lakes says that the "ground water allegations in the

ROD triggered the Defendant Insurers' duty to defend."  Pl. Reply Mem. Supp. Mot. SJ at 3

[Docket No. 222].

But the groundwater allegations contained in the ROD (issued in 2007) differ only in

their level of specificity from the groundwater allegations contained in the draft AOC (issued in

2001).  The ROD identified two specific "contaminants of concern" or "COCs" in the refinery's

groundwater — benzene and thallium — and said that "[t]he COCs in ground water represent a

probable source of migration to off site ground water."  JA Ex. 8 at LOL0137453.  Yet the draft

AOC said that "Midland's operations . . . caused the release of hazardous substances into . . .

ground water," and further said that the "potential movement of hazardous substances" from the

refinery site were "threatened 'releases'" under CERCLA.  JA Ex. 17 at EPAFOIA0010256.  If

(as Land O' Lakes contends) the ROD's allegations about groundwater contamination make the

EPA's 2008 PRP letter a suit for arguably covered damages, then the EPA's 2001 PRP letter

must *also* have been a suit for arguably covered damages.

Notably, in corresponding with Wausau, Land O' Lakes originally took the position that

the EPA's 2001 PRP letter was exactly what this Court finds it to be: a suit for arguably covered

damages that triggered the duty to defend.[18]  Specifically, in responding to Wausau's argument

that the pollution exclusion in post-1971 policies foreclosed coverage under those policies, Land

O' Lakes said in November 2001 that "the duty to defend *has been triggered* . . . ."  JA Ex. 28

at WAU-000640 (emphasis added).  And when Wausau refused to provide a defense on the basis

that the 2001 PRP letter was not a "suit," Land O' Lakes responded in January 2002 by saying

that the PRP letter was in fact a suit and by characterizing Wausau's refusal to provide a defense

---

[18]The record does not appear to contain Land O' Lakes' initial correspondence to
Travelers about the 2001 PRP letter.  *See* JA Ex. 36 at LOL-INS0010515 (referencing a February
15, 2001 letter and a March 5, 2001 fax from Land O' Lakes to Travelers).  But in a letter dated
April 18, 2001, Travelers denied coverage under the policies at issue in this case, saying:

> Because the Land O' Lakes policies pre-date Land O' Lakes[']
> merger with Midland, no property damage could have occurred
> during Land O' Lakes['] policy period.  Therefore, the Land O'
> Lakes policies are not applicable to this matter.

JA Ex. 38 at TRV000907.  This is precisely the argument that the Court rejected as to certain
policies when the Court ruled on Travelers' first summary-judgment motion.  Order Nov. 24,
2010.

"as a declination of coverage and a *breach of [Wausau's] duty to defend.*"  JA Ex. 30 at WAU-000637 (emphasis added).

Land O' Lakes now says that these assertions were pure bluster — that, when it accused Wausau of breaching its duty to defend in 2001, it was just bluffing.  In fact, Land O' Lakes says now, neither Wausau nor Travelers had any duty to defend in response to the EPA's 2001 PRP letter.  According to Land O' Lakes, neither Wausau nor Travelers had a duty to defend until the EPA sent the 2008 PRP letter, which, Land O' Lakes says, sought different damages than the 2001 PRP letter.  *See* Pl. Mem. Opp. Joint Mot. SJ at 23 ("[T]he 2008 soil and water remediation claims made by the EPA were distinct [from] the 'removal of equipment' claims made in 2001.  The 2008 Claims triggered the Defendant Insurers' duty to defend for the first time.").

Land O' Lakes is incorrect.  As Land O' Lakes itself recognized in corresponding with the insurers after receiving the 2008 PRP letter, the claims made by the EPA in the 2008 PRP letter were simply a continuation of the claims made by the EPA in the 2001 PRP letter.  For instance, in an April 2008 letter to Wausau, Land O' Lakes said that it was "follow[ing] up on our letters of 2001 and 2002 . . . ."  JA Ex. 32 at WAU-000596.  Land O' Lakes described the 2008 PRP letter as reflecting the EPA's decision "to press its superfund claims against Land O' Lakes" and asked Wausau to state whether it was "amenable to changing its coverage position."  *Id.*  In a subsequent letter to Wausau, Land O' Lakes said that the 2008 PRP letter had "reawakened a claim that we had believed to be quie[sce]nt."  JA Ex. 34 at WAU-001998.

Land O' Lakes was correct in 2001 when it characterized the PRP letter as a suit for arguably covered damages.  The 2001 PRP letter was one step — and the 2008 PRP letter was another step — in a single, continuous process of EPA enforcement with respect to the Cushing

refinery; there is no reason to treat the 2008 PRP letter as somehow commencing a separate suit. In the 2001 PRP letter, the EPA asked Land O' Lakes to participate in a study (the RI/FS) that would lead to cleanup activity (the RD/RA), and the EPA's allegations of damage to third-party property in the 2001 AOC were sufficient to make the EPA's claims — even apart from the demand for $8.9 million for removal costs in the 2001 PRP letter — claims for arguably covered damages. Accordingly, because Wausau and Travelers refused in 2001 to defend Land O' Lakes against the claims in the 2001 PRP letter, both insurers breached their duty to defend at that time, and the six-year statute of limitations on Land O' Lakes' duty-to-defend claims has run.

### 3. Additional Arguments

Land O' Lakes makes two additional arguments aimed at maximizing any possible recovery on its duty-to-defend claims.[19] The Court has already held that those claims are barred, but, for the sake of completeness, the Court will briefly address Land O' Lakes' two arguments.

First, Land O' Lakes argues that the duty to defend the 2008 PRP letter includes a duty to defend claims related to removal costs, even though the EPA first sought those removal costs in

---

[19]Land O' Lakes also makes an argument that could *reduce* any possible recovery on its duty-to-defend claims. According to Land O' Lakes, Travelers must (under Minnesota law) pay the attorney's fees and costs that Land O' Lakes incurred in pursuing this coverage action, but Wausau need not (under Oklahoma law) pay such fees and costs. Pl. Mem. Supp. Mot. SJ at 28-29. Travelers, however, says that Land O' Lakes has misread Oklahoma law. Travelers Suppl. Resp. Mem. Opp. Pl. Mot. SJ [Docket No. 215]. According to Travelers, Oklahoma law expressly allows an insured to recover attorney's fees and costs in a coverage action under certain conditions, and Land O' Lakes has simply misread the relevant statute (Okla. Stat. tit. 36, § 3629(B)) and a case interpreting that statute (*Barnes v. Oklahoma Farm Bureau Mutual Insurance Co.*, 94 P.3d 25 (Okla. 2004)). Travelers Suppl. Resp. Mem. Opp. Pl. Mot. SJ at 2-3.

Neither Wausau nor Land O' Lakes responded to Travelers' argument on this issue. It thus appears to the Court that, if Land O' Lakes were to prevail on its duty-to-defend claims, Land O' Lakes could potentially recover the fees and costs incurred to pursue this coverage action not only from Travelers, but also from Wausau.

the 2001 PRP letter that (according to Land O' Lakes) the insurers had no duty to defend.  Pl.

Mem. Supp. Mot. SJ at 22.  Land O' Lakes relies on the general principle that "the duty to defend

one claim creates a duty to defend all claims . . . ."  *Wooddale Builders, Inc.*, 722 N.W.2d at 302.

The insurers do not appear to dispute the principle; they simply argue that the 2008 PRP letter

did not trigger a duty to defend.  Given the parties' general agreement on the governing legal

principle, the Court sees no reason to discuss this issue any further.

Second, Land O' Lakes argues that at least some of its past and future expenditures

associated with complying with the UAO should be characterized as the costs of defending the

EPA's action because (according to Land O' Lakes) that money was (or will be) spent to

minimize Land O' Lakes' liability to the EPA.  Pl. Mem. Supp. Mot. SJ at 25-26.  In other

words, Land O' Lakes asks that this portion of its expenditures be treated as defense costs, and

not as indemnity costs, for purposes of the insurance policies that are at issue in this action.

Wausau and Travelers counter by arguing that any expenditure by Land O' Lakes that was

made after the EPA had already done the site investigation (the RI/FS) and selected a remedy (the

RD/RA) would necessarily be an indemnity cost, not a defense cost.  Insurers' Joint Mem. Opp.

Pl. Mot. SJ at 16 [Docket No. 218] ("Once EPA selected the site remedy and fixed [Land O'

Lakes'] liability by issuing the UAO, the costs incurred by [Land O' Lakes] in complying with

that Order became indemnity costs, if covered at all.").  Alternatively, the insurers argue that,

assuming that some of Land O' Lakes' expenditures could be classified as defense costs,

distinguishing those defense costs from indemnity costs would be a question of fact for the jury.

*Id.* at 17-25.  Finally, the insurers argue that if Land O' Lakes were to sue the EPA and seek

reimbursement of some or all of its expenditures, the attorney's fees and costs incurred in

prosecuting that reimbursement action against the EPA would not be defense costs that are the responsibility of the insurers.  *Id.* at 25-31.

The costs that Land O' Lakes seeks to characterize as defense costs can be sorted into three categories: (1) costs related to the period before the EPA issued the UAO in January 2009; (2) costs incurred in complying with the UAO after it was issued; and (3) costs that will be incurred in a future reimbursement action by Land O' Lakes against the EPA.

With respect to the first two categories, the Court agrees with the insurers that whether the claimed costs are defense costs is a question of fact.  Given that the insurers dispute the purpose of the claimed costs, the Court cannot, on summary judgment, simply accept Land O' Lakes' representations about which costs went toward remediation activity (and thus are not defense costs) and which costs went toward reducing the expenses of remediation (and thus are arguably defense costs).

In particular, the Court finds that whether costs incurred after the EPA issued the UAO qualify as defense costs is a question of fact.  In the context of a CERCLA enforcement action, the UAO is like an injunction in an ordinary lawsuit, and costs spent to comply with a UAO are analogous to costs spent to comply with an injunction.  Such costs are generally indemnity costs, not defense costs.  *Cf. Wis. Power & Light Co. v. Century Indem. Co.*, 130 F.3d 787, 792 (7th Cir. 1997) ("[T]he agreement came two years after the Department of Natural Resources had ordered the [insured] to clean up the site.  Costs that the [insured] incurred after the order, either directly or in hiring [a contractor] to clean up the site, were response costs, which the [insured] was required to incur by virtue of governmental command.").

But "generally" does not mean "always."  As the Minnesota Supreme Court recognized in *Domtar, Inc. v. Niagara Fire Insurance Co.*, costs spent by a defendant in responding to an environmental-enforcement action might serve two purposes:  (1) complying with an order to clean up a polluted site, and (2) "minimizing both the scope and magnitude of [the defendant's] ultimate liability for clean-up costs." 563 N.W.2d 724, 738 (Minn. 1997).  *Domtar* held that costs that serve the second purpose may qualify as defense costs, even if they "serve the dual purpose of complying with [an environmental-enforcement action] . . . ." *Id.*

Under *Domtar*, then — which the parties seem to agree applies[20] — whether money spent by Land O' Lakes in response to the UAO qualify as defense costs is an intensely factual question that cannot be resolved on summary judgment given the state of the record in this case. But *Domtar* does provide guidelines for distinguishing pure compliance costs (i.e., costs that cannot qualify as defense costs) from dual-purpose compliance and defense costs (i.e., costs that, because of their hybrid nature, can qualify as defense costs).

In any enforcement action, a defendant will be able to choose different ways to comply with an order issued by an agency.  Suppose, for instance, that the EPA ordered Land O' Lakes to remove 10 tons of polluted dirt as part of a remediation plan.  Land O' Lakes might then pay a consultant $1,000 to identify the cheapest way of hauling that dirt away.  This $1,000 consultant fee would be a compliance cost, not a defense cost, because it would not change the nature of Land O' Lakes' responsibilities under the enforcement order — to remove the 10 tons of polluted dirt.  In *Domtar*'s words, paying the $1,000 fee to the consultant would not change "both the

---

[20]*See* Insurers' Joint Mem. Opp. Pl. Mot. SJ at 2 ("This . . . is not a case like *Domtar* in which an insured agreed to perform a site investigation so as to minimize its ultimate cleanup liability."); Pl. Reply Mem. Supp. Mot. SJ at 8-9.

scope and magnitude of [the defendant's] ultimate liability for cleanup costs."  563 N.W.2d at 738.

Suppose, however, that Land O' Lakes paid a consultant $1,000 to show that the dirt did not need to be hauled away, but instead could be decontaminated at the site — and that cleaning the dirt at the site would be cheaper than hauling it away.  Suppose further that Land O' Lakes then used the consultant's report to persuade the EPA to change its requirement — that is, to allow Land O' Lakes to treat the dirt in place rather than haul it away.  Under these circumstances, the money paid to the consultant would not be to find the cheapest way to *comply* with the EPA's order, but instead to persuade the EPA to *change* its order.  The $1,000 consultant fee would thus likely qualify as a defense cost under *Domtar*.

Finally, with respect to the third category — costs associated with bringing a future reimbursement action against the EPA — the Court agrees with Land O' Lakes that such costs would be defense costs.  The insurers analogize such claims to counterclaims and cite myriad cases holding that the cost of bringing a counterclaim is not a cost of defense.  *See* Insurers' Joint Mem. Opp. Pl. Mot. SJ at 27-30 (citing cases).  But the analogy between a CERCLA reimbursement action and a counterclaim is weak.  A counterclaim is an independent claim that a defendant has against a plaintiff — a standalone claim that the plaintiff violated the defendant's rights and owes it compensation.  The defendant could bring that claim against the plaintiff whether or not the plaintiff sued it.  But given how CERCLA enforcement actions are structured, a reimbursement action — despite taking the form of a freestanding lawsuit — is not, in fact, a claim against the EPA that is separate from the enforcement action.  Rather, a reimbursement

action is, in effect, a way of *defending* the enforcement action.  Indeed, it is the *only* practical way of defending an enforcement action.

In an ordinary lawsuit, a defendant is not ordered to pay damages (or comply with an injunction) until after mounting a defense.  In contrast, in an EPA-enforcement action, any sensible defendant will comply with an EPA order first — before mounting a defense — because the penalties for failing to comply with an EPA order are so steep.[21]  After conducting the EPA-ordered cleanup, if a defendant believes that it should not have borne the costs of the cleanup, CERCLA permits the defendant to "petition the [EPA] for reimbursement from the [Superf]und . . . ." 42 U.S.C. § 9606(b)(2)(A).  If the petition is denied, CERCLA permits the defendant to "file an action against the [EPA] in the appropriate United States district court seeking reimbursement from the [Superf]und." 42 U.S.C. § 9606(b)(2)(B).

Thus, although Land O' Lakes will be the nominal plaintiff in a future reimbursement action against the EPA under § 9606(b)(2), Land O' Lakes will — in substance — be defending itself against the EPA's enforcement action.  In short, although Land O' Lakes must (for all practical purposes) pay first and defend itself later, Land O' Lakes' costs for bringing the reimbursement action remain defense costs for purposes of the CGL policies at issue in this case.

---

[21]*See* 42 U.S.C. § 9606(b)(1) (establishing a daily fine of $25,000 for "[a]ny person who, without sufficient cause, willfully violates, or fails or refuses to comply with" an order under § 9606(a)); 40 C.F.R. § 19.4, Table 1 (increasing daily fine under § 9606(b)(1) to $37,500 effective January 12, 2009); 42 U.S.C. § 9607(c)(3) (providing that a polluter who "fails without sufficient cause to properly provide removal or remedial action upon order of the [EPA]" must pay up to three times the amount spent by the EPA as a result of the polluter's noncompliance).

### D.  Duty to Indemnify — Wausau and Travelers

The duty to indemnify is narrower than the duty to defend.  *Wooddale Builders, Inc.*, 722 N.W.2d at 302.  Although claims that are even arguably covered give rise to the duty to defend, only claims that are actually covered give rise to the duty to indemnify.  *See Reins. Ass'n v. Timmer*, 641 N.W.2d 302, 308 (Minn. Ct. App. 2002) ("[T]o establish a duty to indemnify, the insured must prove that *all* claims alleged in the complaint fall within the policy coverage." (emphasis in original)).

Land O' Lakes seeks a declaration that the insurers will be required to indemnify it for the costs of remediating the Cushing refinery site, whatever those costs may turn out to be.  Pl. Mem. Supp. Mot. SJ at 29-31.  Because Land O' Lakes' ultimate liability for remediation costs will not be known until the conclusion of Land O' Lakes' reimbursement action against the EPA, Land O' Lakes does not now seek a specific amount of damages for its indemnification claim.  *Id.* at 31.

The insurers' main argument against indemnification is based on the policies' owned-property exclusions.[22]  According to the insurers, the damages for which Land O' Lakes seeks indemnification arise out of injury to property that was owned by Land O' Lakes' predecessor, Midland.  The insurers argue that because every policy at issue excludes coverage for injury to property owned by the insured, the insurers have no duty to indemnify Land O' Lakes for any

---

[22]A representative owned-property exclusion provides in relevant part that the policy

does not apply . . . to injury to or destruction of . . . property owned
or occupied by or rented to the insured, . . .

JA Ex. 6 at TRV000051.  Excerpts from the various owned-property exclusions in each policy at issue are summarized in a table in Exhibit 4 to the insurers' joint appendix.

costs associated with cleaning up the Cushing refinery site.  Insurers' Joint Mem. Opp. Pl. Mot. SJ at 4-13; Insurers' Joint Mem. Supp. Mot. SJ at 31-47 [Docket No. 165].

Secondarily, Wausau argues that certain of its policies cover only "accidental" injury to property and that disputes of fact exist over whether the claimed injuries were "accidental."[23] Joint Mem. Opp. Pl. Mot. SJ at 41-43.  Further, Land O' Lakes and the insurers disagree about how to allocate damages over time if any damages are found to be covered.  *Id.* at 44-50; Pl. Mem. Supp. Mot. SJ at 31-33.

Below, the Court first addresses the owned-property exclusion.  Because the Court agrees with the insurers that this exclusion relieves them of any duty to indemnify Land O' Lakes, the Court need not address the parties' other arguments.  Nonetheless, for the sake of completeness, the Court will briefly address Wausau's argument about whether the claimed damages resulted from an "accident" and the parties' dispute about allocating damages over time.

### 1.  The Owned-Property Exclusion

The insurance policies at issue in this case all provide coverage for injury to property caused by a covered accident or occurrence.  *See* JA Ex. 3 (table of insuring clauses excerpted from the policies).  But all of the policies also feature an owned-property exclusion that excludes coverage for injury to property owned by the insured.  *See* JA Ex. 4 (table of owned-property exclusions excerpted from the policies).  Thus, taken as a whole, the policies provide

---

[23]Wausau also argues that under policies in effect from March 1971 through March 1975, a pollution exclusion precludes coverage.  Wausau Suppl. Mem. Supp. Mot. SJ at 13-14.  Under those policies, injury to property caused by pollution is covered only if the injury results from a "'sudden and accidental'" discharge of pollutants.  *See id.* at 13 (quoting policy language).  Land O' Lakes did not oppose this argument in its briefing and conceded at the summary-judgment hearing that because of the pollution exclusion, Land O' Lakes is not entitled to coverage under these policies.

coverage to Land O' Lakes for damages that it must pay because of contamination of the property of third parties, but not for damages that it must pay because of contamination of the property that was owned by Midland at the time that it was contaminated.

Determining the scope of an owned-property exclusion involves two separate questions: First, what qualifies as property owned by an insured, as opposed to property owned by a third party?  And second, when might injury to property owned by an insured — whatever that property might be — be covered despite an owned-property exclusion?  The Court addresses the second question first.  In doing so, the Court treats the question — as do Land O' Lakes, Wausau, and Travelers — as one of Minnesota law.  *See, e.g.*, Insurers' Joint Mem. Opp. Pl. Mot. SJ at 7-13; Insurers' Joint Mem. Supp. Mot. SJ at 44-47; Pl. Mem. Opp. Joint Mot. SJ at 11-16.

In very narrow circumstances, injury to property owned by an insured may be covered under Minnesota law despite an owned-property exclusion.  Specifically, *Domtar* held that "if there is actual injury and an existing threat to third-party property (whether private or public), then clean-up on the insured's own property that is designed to protect third-party property is not excluded" by an owned-property exclusion.  563 N.W.2d at 734.  *Domtar* thus created an exception to the general rule that a CGL policy with an owned-property exclusion does not cover the costs of cleaning up an insured's own property — even if the cleanup is necessary to prevent injury to third-party property.[24]  According to *Domtar*, the owned-property exclusion does not apply to the costs of cleaning up an insured's own property when those cleanup costs are

---

[24]*See N. States Power Co. v. Fid. & Cas. Co. of N.Y.* ("*NSP I*"), 504 N.W.2d 240, 245 (Minn. Ct. App. 1993) ("Expenditures to prevent future pollution of a type which has yet to occur or from a source which has yet to cause pollution . . . are not covered because these costs are not causally related to the property damage."), *aff'd as modified*, 523 N.W.2d 657 (Minn. 1994).

"designed to protect third-party property" *and* when "there is actual injury . . . to third-party property."  In this case, whether coverage is available to Land O' Lakes notwithstanding the owned-property exclusion depends on what *Domtar* meant by the phrase "there is actual injury . . . to third-party property."

According to Land O' Lakes, "there is actual injury" to third-party property for purposes of *Domtar* whenever, at *any* point in the past, *any* type of injury was caused to *any* third-party property — even if that third-party property is not the same as the property that is under the "existing threat" that the cleanup is designed to eliminate.  Applying this principle to the facts of this case, Land O' Lakes argues that, because (according to the EPA) pollution at the Cushing refinery injured Skull Creek and the Cimarron River in the 1970s — and because waterways are third-party property — "there is actual injury" to third-party property for purposes of *Domtar*. *See, e.g.*, Pl. Mem. Supp. Mot. SJ at 23-25.[25]  Thus, according to Land O' Lakes, all of the money that it now spends to clean up the site in order to protect *any* third-party property (not just Skull Creek and the Cimarron River) from future contamination is not excluded by the owned-property exclusion.

The Court rejects Land O' Lakes' breathtakingly broad interpretation of *Domtar*'s actual-injury requirement.  Land O' Lakes' interpretation is inconsistent with common sense, with the insuring clause of a typical CGL policy, and with both *Domtar* and the case on which *Domtar* most heavily relied in discussing the owned-property exclusion, *Northern States Power Co. v.*

---

[25]Similarly, Land O' Lakes argues that injury to the health of people living near the Cushing refinery between 1953 and 1977 satisfies *Domtar*'s requirement of "actual injury" to third parties.  *See* Pl. Mem. Supp. Mot. SJ at 24.

*Fidelity and Casualty Company of New York* ("*NSP I*"), 504 N.W.2d 240 (Minn. Ct. App. 1993), *aff'd as modified*, 523 N.W.2d 657 (Minn. 1994).

First, as to common sense: Suppose that Land O' Lakes was still operating the Cushing refinery and that Land O' Lakes was ordered by the EPA to replace a giant storage tank on the southeast corner of the site because the tank was badly corroded and could begin to leak chemicals onto property owned by Mary Jones that adjoined the site. Suppose further that at no time in the past had any emission from the Cushing site contaminated the property of a third party. Land O' Lakes concedes that, under these circumstances, the costs incurred by Land O' Lakes to replace the storage tank would not be covered by insurance — even if the purpose of the replacement was to protect the Jones property — as those replacement costs would fall within the owned-property exclusion.

Now take the same facts, except suppose that a pipe running along the northwest boundary of the property developed a small leak in 1947 and caused an ounce of oil to seep onto adjoining property owned by John Smith. Now, according to Land O' Lakes, the owned-property exclusion does not apply, and the insurers must cover the costs of replacing the storage tank that threatens to spill chemicals onto Jones's land. This is true, says Land O' Lakes, even though the oil leak in 1947 has nothing to do with the threatened chemical spill in 2012 — and even though the oil leak damaged the property of Smith, and the corroded storage tank threatens the property of Jones. This is a facially absurd result, and, despite being pressed to do so at oral argument, Land O' Lakes could not come up with a single sensible reason why something like a one-ounce oil leak in 1947 should so dramatically affect the scope of the owned-property exclusion in 2012.

Second, as to the insuring clause of a CGL policy, *Domtar*, and *NSP I*:  The insuring clause of a typical CGL policy covers damages that the insured must pay "because of" injury to property caused by a covered occurrence or accident.  *See* JA Ex. 3.  In other words, there must be a causal relationship between (1) the damages for which indemnification is sought (here, the cost of cleaning up the Cushing refinery) and (2) an occurrence or accident that injured third-party property.  But Land O' Lakes' theory of *Domtar*'s actual-injury requirement altogether eliminates any such causal requirement.  According to Land O' Lakes, if its own polluted property currently threatens to injure third-party property (such as when the corroded storage tank threatens to leak chemicals onto the Jones property), and if its own polluted property injured third-party property on a single occasion decades ago (such as when an ounce of oil leaked onto the Smith property), then the cost of cleaning up its own polluted property today is covered despite the owned-property exclusion — even if the current cleanup has absolutely no relationship to the injury to third-party property that occurred decades ago.  On Land O' Lakes' theory, once any injury to any third-party property occurs — once the first drop of oil hits the Smith property in 1947 — a switch is flipped that can never be switched off, and money spent to clean up its own property will always be covered as long as the cleanup prevents injury to any third-party property.

Clearly, however, Minnesota law requires a closer connection between the injury to third-party property and the money spent to clean up the insured's own property if the cleanup is to be covered notwithstanding an owned-property exclusion.  In *NSP I*, for instance, the court rejected an insurer's argument that certain environmental-cleanup costs were excluded from coverage by an owned-property exclusion.  The insurer argued that it did not have to pay for removal of

contaminated soil from its insured's property because "no money has been spent to remedy the

contamination of the groundwater" — groundwater that, under Minnesota law, is third-party

property — "but only to excavate and remove contaminated soil."  504 N.W.2d at 246.  In

rejecting this argument, *NSP I* held that "because groundwater pollution has occurred, the 'own

property' exclusion does not bar coverage for cleanup expenses needed to correct already

existing soil contamination which *continues* to damage the groundwater."  *Id.* (emphasis added).

In other words, because injury to the insured's own property (its contaminated soil) was causally

related to *ongoing* injury to third-party property (the groundwater), the owned-property exclusion

did not preclude coverage of the costs of cleaning up the insured's own property.  *NSP I*

summarized the distinction between covered and uncovered damages this way:

> The primary concern here [i.e., with respect to covered damages] is
> to clean up and prevent further damage to public resources, not
> solely to remedy problems located on the insured' s property.

> Mandated expenses remedying problems confined on
> NSP's property that do not rectify the groundwater and associated
> soil contamination, however, are precluded from coverage by [the
> owned-property] exclusion.

*Id.*

NSP I's requirement of a causal relationship between covered cleanup activities and

injury to third-party property is consistent with *Domtar*.  *Domtar* did not actually decide what

type of third-party injury suffices to avoid the application of an owned-property exclusion,

because *Domtar* held that the owned-property exclusion did not apply because the insured did not

own the property at issue when the insurance policies at issue were in effect.  563 N.W.2d at 734.

Nonetheless, *Domtar* said that the costs of cleaning up an insured's property fall outside an

owned-property exclusion "if there is actual injury and an existing threat to third-party

property . . . ."  *Id.*  Critically, *Domtar* said "is," not "has been" or "was."  In other words, *Domtar* held that, if the insured is to escape the owned-property exclusion, the "actual injury" to third-party property must exist *now*.

In sum, the Court holds that, under both *Domtar* and *NSP I*, the cost of replacing, repairing, or cleaning up one's own property falls within the owned-property exclusion unless that cost is causally related to remedying an injury to third-party property that exists at the time of the replacement, repair, or cleanup.  In other words, the owned-property exclusion applies unless, at the time of the replacement, repair, or cleanup:  (1) third-party property is contaminated; (2) that contamination was caused by the insured's own property; (3) the insured's own property poses a continuing threat of contamination to the third-party property (that is, the third-party property that has already been contaminated); and (4) the replacement, repair, or cleanup of the insured's own property is designed to protect the contaminated third-party property from further contamination.

Given the Court's reading of *Domtar*, then, all of the money that Land O' Lakes must spend to clean up the Cushing refinery site falls within the owned-property exclusion unless Land O' Lakes can show that a piece of third-party property had been contaminated by the Cushing refinery site, the piece of third-party property remained contaminated at the time that Land O' Lakes was ordered to clean up the Cushing refinery site, the Cushing refinery site posed a continuing threat of contamination to the piece of third-party property, and the cleanup of the Cushing refinery site was designed to protect the piece of third-party property from further contamination by the Cushing refinery site.  According to Land O' Lakes, the cleanup of its own property at the Cushing refinery site was designed to protect three types of presently injured

third-party property from further contamination:  (1) groundwater, (2) the environment in

general, and (3) wildlife.  The Court examines Land O' Lakes' claims in turn.

    *First*, as to groundwater:  The Court agrees with the insurers that to determine what

qualifies as "owned" property under the Wausau and Travelers policies, the Court must look to

Oklahoma law.  Land O' Lakes does not appear to disagree.  *See* Pl. Mem. Opp. Joint Mot. SJ

at 11-16 (responding to insurers' owned-property argument without arguing that Minnesota law

should apply to determine what property was owned by Midland).

    The reason for looking to Oklahoma law is simple:  For property to be "owned" by an

insured for purposes of an insurance policy, the property must actually be owned by the insured.

And whether Midland actually owned property in Oklahoma is necessarily a question of

Oklahoma law.  *See, e.g.*, *In re Estate of Washburn*, 20 N.W. 324, 325 (Minn. 1884) ("[R]eal

estate is exclusively subject to the laws of the government within whose territory it is situated.").

Put another way, to determine whether the Cushing refinery was owned by Midland, it would

make no sense to ask:  "If the refinery were *not* located in Oklahoma, *would* Midland own it?"

Instead, the only sensible question would be:  "Given that the refinery *is* located in Oklahoma,

*does* Midland own it?"

    Land O' Lakes does not argue that groundwater in Oklahoma is, as a general rule, third-

party property, and for good reason:  Oklahoma law is plainly to the contrary.  Okla. Stat. tit. 60,

§ 60(A) ("The owner of the land owns water standing thereon, or flowing over or under its

surface but not forming a definite stream.").  Instead, Land O' Lakes relies on provisions in

CERCLA and Oklahoma's environmental-protection laws that define groundwater as a "natural

resource" or as part of the "environment."[26]  But these provisions are beside the point.  The

critical question under the CGL policies is not how CERCLA or its Oklahoma analog defines

"natural resource" or "environment" for the purposes of an environmental-protection statute; the

critical question is what qualifies as property owned by the insured for purposes of the CGL

policies.  There is no question that, under Oklahoma law, Midland owned the groundwater under

the Cushing refinery.  *See* Okla. Stat. tit. 60, § 60(A).  Thus any injury to that groundwater was

injury to Midland's own property and falls within the owned-property exclusion.

*Second*, as to the environment in general:  The Court does not agree with Land O' Lakes

that the government's interest in protecting the environment means that any injury to the

environment is necessarily injury to third-party property for purposes of an owned-property

exclusion.  Contrary to Land O' Lakes' contention, the Eighth Circuit did not endorse its position

in *Continental Insurance Co. v. Northeastern Pharmaceutical & Chemical Co.*, 811 F.2d 1180

(8th Cir. 1987).  *See* Pl. Mem. Opp. Joint Mot. SJ at 12.  *Continental Insurance* said that "state

and federal governments suffer injury to their 'quasi-sovereign' interests when pollutants are

released into the soil, water, and air within their jurisdiction."  811 F.2d at 1185.  But the

question in *Continental Insurance* was whether "the improper release of toxic wastes may cause

'property damage' *not only* to the actual owner of the land, water, or air, but *also* to state and

---

[26]*See* 42 U.S.C. §§ 9601(8)(B) ("The term 'environment' means . . . any other . . .ground
water . . . within the United States . . . ."), 9601(16) ("The term 'natural resources' means . . .
ground water . . . ."); Okla. Stat. tit. 27A, § 1-1-201(20) ("'Waters of the state' means all . . .
accumulations of water, surface and underground, . . . which are contained within, flow through,
or border upon this state or any portion thereof . . . .").  Land O' Lakes erroneously cites Okla.
Stat. tit. 27A, § 2-6-101 for the proposition that "'waters of the State' are defined to include
groundwater for purposes of environmental regulation in Oklahoma."  Pl. Mem. Opp. Joint Mot.
SJ at 14.  The cited statute does not define "waters of the State," nor does it define
"groundwater."

federal governments because of their interest independent of and behind the titles of its citizens in all the earth and air within [their] domain." *Id.* at 1187 (emphasis added; citation and internal quotation marks omitted).

Even if *Continental Insurance* were relevant to Oklahoma's law of property ownership (and it likely is not), it would not help Land O' Lakes. By its own terms, *Continental Insurance* simply held that certain first-party property — i.e., property belonging to its "actual owner" — may *also* qualify as the "property" of the government for some purposes. But the fact that a piece of property owned by Midland may *also* be owned by the government does not mean that the property is *not* owned by Midland. In other words, the government's interest in the environment does not magically turn "owned" property into "unowned" property for purposes of an owned-property exclusion. And that only makes sense: Defining third-party property to include the environment would vitiate the owned-property exclusion, because every blade of grass on every plot of land is both the property of the land's owner *and* a part of the "environment." An interpretation of "owned property" that would vitiate just about every owned-property exclusion in existence cannot be correct.

*Finally*, as to wildlife: The Court rejects Land O' Lakes' argument that injury to wildlife at the Cushing refinery is sufficient injury to third-party property to take the EPA's claims outside of the owned-property exclusion. *See* Pl. Mem. Supp. Mot. SJ at 24. It is true that Oklahoma law defines wildlife as the property of the state. Okla. Stat. tit. 29, § 7-204 ("All wildlife found in this state is the property of the state."). But hazardous waste confined to private property that poses a risk to the health of birds or squirrels who come into contact with the property cannot be considered injury to third-party property under a CGL policy for the same

-48-

reason that injury to the environment generally — which, like wildlife, is the property of state and federal governments for some purposes — cannot create coverage for injury to the insured's private property.  To hold otherwise would defeat the entire purpose of an owned-property exclusion, which is to protect against moral hazard.[27]  An insured would be able to damage its own land and, as long as a single bird could alight on that land — or a single squirrel could scamper across that land — the insured could seek coverage under a CGL policy for its self-inflicted damages.  Once again, just about every owned-property exclusion in existence would be vitiated as a practical matter.

Further, the Court finds virtually no evidence in the record that the EPA-ordered cleanup of the Cushing refinery was causally related to any existing harm to wildlife.[28]  For the reasons given above, without such a causal connection between existing third-party harm and the costs of cleaning up the Cushing refinery site, the owned-property exclusion precludes coverage of those costs.

---

[27]According to an insurance-law treatise:

> Moral hazard describes a behavioral reaction when a party is protected from the consequences of a risk.  The protected party — in this case, someone covered by insurance for a particular loss — may behave differently than he would have behaved if he were fully exposed to the risk.  Specifically, he may have a tendency to act less carefully because someone else will bear the consequence of any resulting loss.  The less careful behavior makes it more likely that a loss will occur.

1-1 *New Appleman on Insurance Law Library Edition* § 1.01 [4][b] (2011).

[28]*See* Wilson Aff. [Docket No. 109] Ex. 7 at LOL0150499 (RI found that "[a]lthough[] no visible adverse ecological effects to terrestrial and aquatic receptors were observed during field investigations . . . , the quantitative assessment . . . indicates that the plant and wildlife communities within the Site *may* be experiencing *some* adverse [e]ffects due to the detected contaminants." (emphasis added)).

2.   Whether Damages Resulted from an "Accident"

The Wausau policies in effect for 15 policy years — from 1951-52 through 1965-66 —

provided coverage for "damages because of . . . destruction of property . . . caused by accident."

*See* JA Ex. 3 at 4-7.  Wausau argues that the damages for which Land O' Lakes seeks coverage

were not caused by an "accident" under Oklahoma law.  Insurers' Joint Mem. Opp. Pl. Mot. SJ

at 41-43.  Alternatively, Wausau argues that whether the damages were caused by an "accident"

under Oklahoma law is a disputed issue of fact.  *Id.* at 43.

Land O' Lakes and Wausau agree that Oklahoma law governs how to interpret the term

"accident" in the Wausau policies at issue, and the Court sees no reason to question their

agreement.  *See* Pl. Mem. Supp. Mot. SJ at 19; Joint Mem. Opp. Pl. Mot. SJ at 41.  But Land O'

Lakes and Wausau disagree over what constitutes an "accident" under Oklahoma law.

The Court finds that Oklahoma law can be read two different ways, which makes the

word "accident" in the Wausau policies ambiguous.  Under Oklahoma law, when an insurance

policy is ambiguous, the policy must be interpreted to reflect the reasonable expectations of the

insured.  *See Max True Plastering Co.*, 912 P.2d at 863.  The Court holds that an insured could

reasonably expect that the damages for which Land O' Lakes seeks coverage were "caused by

accident" for purposes of the Wausau policies.  *See First Bank of Turley*, 928 P.2d at 303 n.12

(explaining Oklahoma's reasonable-expectations doctrine).

In *United States Fidelity & Guaranty Co. v Briscoe*, the Oklahoma Supreme Court

discussed at length the meaning of the word "accident" in an insurance policy.  239 P.2d 754

(Okla. 1952).  *Briscoe* involved a claim for damages resulting from cement dust that blew from a

highway contractor's cement-loading mill into nearby houses, injuring the occupants.  *Id.* at 755.

-50-

The contractor operated the mill more-or-less continuously for about four months.  *Id.*  In holding

that the claimed damages did not arise from an "accident" — and therefore were not covered

under a policy that insured against damages "caused by accident" — *Briscoe* said:

> [T]he distinguishing characteristic feature of an accident is the
> distinctive event or determinable, unexpected happening, occurring
> during the time in question, the date of which can be fixed with
> certainty.  Such incident or occurrence must have arisen from an
> event capable of being identified with respect to time, place and
> circumstances.

*Id.* at 758.

The quoted passage, standing alone, supports Wausau's argument that environmental

contamination that results from more-or-less continuous operations — such as the type of

contamination that occurred at the Cushing refinery under Midland's ownership — is not the

result of an "accident" for purposes of Oklahoma law.  This passage seems to draw a line

between a time-limited event (such as a car accident or a refinery-tank fire) and ongoing

operations.  Thus, one could say (relying on *Briscoe*) that, because the contamination of the

Cushing refinery site was not due to a "distinctive event or determinable, unexpected

happening," the contamination was *not* the result of an "accident" for purposes of Oklahoma law.

But *Briscoe* also said the following:

> [T]he claims asserted against contractor were not predicated on, or
> caused by accident, and not within the coverage of insurance
> policy, sued upon.  They were predicated upon a series of acts,
> which continued approximately four months, and, at all times,
> *voluntary, intentional, tortious, and wrongful*, resulting from
> negligent conduct of contractor. . . . From facts of this case, both
> the means and result were, in no sense, accidental.

*Id.* (emphasis added).  The words "voluntary, intentional, tortious, and wrongful" in this passage

point to a different meaning of the word "accident" — a meaning that focuses more on the intent

of the actor responsible for an alleged accident, and less on whether a particular action alleged to be an accident was isolated or ongoing.  There is no dispute that Midland did not intentionally damage the environment by contaminating the Cushing refinery site with hazardous waste.  Thus, one could say (relying on *Briscoe*) that, because Midland's actions were not "voluntary, intentional, tortious, and wrongful," the resulting environmental contamination *was* the result of an "accident" for purposes of Oklahoma law.

The Court sees no reason to privilege one reading of *Briscoe* over another.  In particular, the Court rejects Land O' Lakes' argument that *Penley v. Gulf Insurance Co.*, 414 P.2d 305 (Okla. 1966), somehow means that an accident can include routine acts done intentionally for a long period of time.  Pl. Reply Mem. Supp. Mot. SJ at 20.  The event at issue in *Penley* was as discrete and identifiable as can be:  The insured put the wrong fuel in a truck on September 11, 1959.  414 P.2d at 306.  And *Penley* actually quoted *Briscoe*'s definition of an accident as an "'event capable of being identified with respect to time, place and circumstances.'"  *Id.* at 309 (quoting *Briscoe*).  *Penley* does not help Land O' Lakes.

Even setting *Penley* aside, however, the Court finds that *Briscoe*'s discussion of the word "accident" is ambiguous.  Because the term is ambiguous, Oklahoma's reasonable-expectations doctrine applies.  And because an insured could reasonably expect that the contamination of the Cushing site — contamination that the operators of the site did not intentionally cause — was "caused by accident" for purposes of the Wausau policies, the Court rejects Wausau's argument that the damages claimed by Land O' Lakes do not result from an "accident" and are therefore not covered.

3.  Allocation of Damages

Under Minnesota law, damages for environmental contamination that takes place over an

extended period of time are allocated by the "'pro rata by time on the risk'" method.  *N. States*

*Power Co. v. Fid. & Cas. Co. of N.Y.* ("*NSP II*"), 523 N.W.2d 657, 663 (Minn. 1994).  In other

words, "[e]ach triggered policy . . . bears a share of the total damages proportionate to the

number of years it was on the risk relative to the total number of years of coverage triggered."

*Id.*

Under this approach, determining the beginning and end dates of the damages period is

essential.  If the damages period is 30 years, then an insurer who was the sole insurer for one year

would bear up to 1/30th of the damages (depending on the policy limits and the total damages);

but if the damages period is 10 years, the same insurer would bear up to 1/10th of the damages.

*See id.* at 664.

Identifying when the damages period began and ended in this case involves various

factual questions and one legal question.  The factual questions — such as when the

contamination of the Cushing refinery site began and ended — cannot be resolved on the

summary-judgment record.  The legal question, however, can be.

Under the pro-rata-by-time-on-the-risk method, an insured who chooses to go without

coverage for a period of time must bear the portion of the total damages that is allocated to that

period of time.  In other words, an insured who voluntarily self-insures is treated like an

insurance company for the periods of self-insurance.  But an insured who is *involuntarily* self-

insured is *not* required to bear the damages allocated to periods of self-insurance.  As *Wooddale*

*Builders* held:

> Allocating damages to the insured for periods during which it elected to be self-insured, but not allocating damages for periods during which . . . coverage was not available to the insured, results in holding the insured responsible for only those risks that it elected to assume.

722 N.W.2d at 297.  Thus, a period of involuntary self-insurance is a period in which insurance was "not available" to the insured for the risk at issue.

Land O' Lakes argues that, under *Wooddale Builders*, the costs of cleaning up the Cushing refinery should be allocated only to the period during which Midland owned the refinery, namely 1943 to 1977.  Pl. Mem. Supp. Mot. SJ at 31; Pl. Reply Mem. Supp. Mot. SJ at 13-14.  Whether to allocate damages to the period after 1977 turns on disputed factual questions such as the time the contamination ended and the purpose of various cleanup costs, which are questions for a jury. Whether to allocate damages to the period before 1943, however, turns on the meaning of *Wooddale Builders*.

Land O' Lakes does not deny that contamination may have occurred at the Cushing refinery before 1943.  But Land O' Lakes argues that because Midland did not own the refinery before 1943, insurance covering the refinery's operations before 1943 was not "available" to Midland, and thus under *Wooddale Builders*, no damages should be allocated to the pre-1943 period.  The Court disagrees.

Under *Wooddale Builders*, an insured must bear "those risks that it elected to assume." 722 N.W.2d at 297.  Even if Midland could not have insured the Cushing refinery before 1943 (because it did not own the refinery before 1943), Midland "elected to assume" the risks and benefits associated with the refinery when Midland bought it.  Sometimes you buy a used car that turns out to be a lemon, and sometimes you buy a used refinery that turns out to be contaminated.

Either way, you get stuck with big bills.  Land O' Lakes cannot pass onto its insurers the costs of cleaning up hazardous waste on the Cushing refinery site if that hazardous waste was part of what Midland (as Land O' Lakes' predecessor) bought in the first place.

Further, the Court questions the premise of Land O' Lakes' argument — namely, that Midland could not have purchased insurance that would have covered liability arising because of acts that occurred at the Cushing refinery before Midland bought the refinery.  Earlier in this proceeding, Land O' Lakes successfully argued that some of the policies that *it* purchased covered liability arising because of acts that occurred at the Cushing refinery years before Land O' Lakes acquired Midland.  Order Nov. 24, 2010.  Land O' Lakes has not explained why, if such coverage was available to it, such coverage was not available to Midland.  In other words, Land O' Lakes has not explained why, prior to 1943, Midland could not have purchased insurance that would have covered liability arising because of acts that occurred at the refinery before 1943.

In any event, the bottom line is that if any of the damages at issue in this case resulted from pre-1943 contamination of the Cushing refinery, then an appropriate portion of the damages should be allocated to the pre-1943 period, despite the fact that neither Land O' Lakes nor Midland purchased insurance covering the refinery during that period.

### E.  Contribution — White Mountains

White Mountains is the successor to two companies that wrote CGL policies[29] to Midland's Minneapolis office:  American Farmers Insurance Company ("American Farmers")

---

[29]Strictly speaking, the policies were combined "Comprehensive General" and "Automobile" liability policies, which are sometimes referred to as "CGAL" policies.  For the sake of simplicity, the Court refers to them as CGL policies.

and Mutual Service Casualty Insurance Company ("MSC").  American Farmers wrote policies covering roughly four policy years, from mid-1945 through March 1949 (and perhaps also through March 1950).  MSC wrote policies covering four later policy years, from 1978 through 1981 (and perhaps also 1976 and 1977).[30]

Wausau and Travelers seek contribution from White Mountains for defense costs under certain of these policies.  Wausau and Travelers do not seek contribution for indemnity costs. Insurers' Joint Mem. Opp. White Mountains Mot. SJ at 2 n.2 [Docket No. 216] ("[T]here is no longer any need for Insurer Defendants to maintain a contribution claim with respect to [Land O' Lakes'] indemnity costs.").

White Mountains makes several arguments for why it has no obligation to contribute to the insurers for their payment of Land O' Lakes' defense costs.  Given that the Court has found that the insurers have no obligation to pay Land O' Lakes' defense costs, White Mountains' arguments about contribution are now moot.  For the sake of completeness, though, the Court will briefly address White Mountains' arguments.

The Court first addresses White Mountains' central argument — namely, that under *Cargill, Inc. v. Ace American Insurance Co.*, 784 N.W.2d 341 (Minn. 2010), the insurers are

------

[30]MSC also issued "umbrella" policies to Midland covering ten policy years, from 1972 through 1981.  *See* White Mountains Mem. Supp. Mot. SJ at 7-8 [Docket No. 171].  Although Wausau and Travelers at one time sought contribution from White Mountains based on the 1976 to 1981 umbrella policies, *see id.*, Wausau and Travelers abandoned any such contribution claim in responding to White Mountains' summary-judgment motion.  Insurers' Joint Mem. Opp. White Mountains Mot. SJ at 11 n.9 [Docket No. 216] ("Insurer Defendants . . . seek defense-cost contribution only under the American Farmers and MSC primary policies, and not the MSC umbrella policies.").  The Court therefore need not consider any contribution claims related to the umbrella policies.

barred from seeking contribution because they breached their duty to defend Land O' Lakes.  The

Court then turns to White Mountains' other arguments.

1.  A Breach of the Duty to Defend Precludes Contribution

*a.  Choice of Law*

Travelers does not dispute that Minnesota law — and thus *Cargill* — applies to its

contribution claims.  But Wausau asserts in a footnote that Oklahoma law applies to its

contribution claims.  Insurers' Joint Mem. Opp. White Mountains Mot. SJ at 14 n.10.

Wausau has not even attempted to explain why its contribution rights against White

Mountains would be governed by Oklahoma law.  Wausau apparently assumes that because the

policies it wrote are generally governed by Oklahoma law, Wausau's rights against White

Mountains should also be governed by Oklahoma law.  This assumption is faulty.

Wausau's contribution claim against White Mountains is not based on the policies that

Wausau wrote to cover the Cushing refinery (policies that are governed by Oklahoma law), but

rather by the policies that White Mountains' predecessors wrote to cover Midland (policies that

are governed by Minnesota law).  White Mountains' predecessors did not issue any insurance

policies in Oklahoma or to an Oklahoma corporation.  Rather, White Mountains' predecessors

issued policies in Minnesota to Midland, which was headquartered in Minnesota when the

policies were written.  The Court agrees with White Mountains that, based on Minnesota's five-

factor choice-of-law test, Minnesota law governs Wausau's contribution claims against White

Mountains.

The test's five factors are: (1) predictability of results; (2) maintenance of interstate order;

(3) simplification of the judicial task; (4) advancement of the forum's governmental interests;

and (5) application of the better rule of law.  *Milkovich v. Saari*, 203 N.W.2d 408, 412 (Minn. 1973); *see also Jepson v. Gen. Cas. Co. of Wis.*, 513 N.W.2d 467, 470 (Minn. 1994).  In this case, Minnesota has a strong interest in applying its law to contribution claims against insurers who write policies in Minnesota.  And the judicial task is simplified by applying Minnesota law, which applies to most of the issues in this case.  Further, the judicial task is simplified in contribution cases generally, and results are more predictable, if a contribution claim is governed by the law of the state whose law otherwise governs the policy under which contribution is sought.

Whether Oklahoma or Minnesota has a "better" rule is not clear because the Oklahoma rule is not clear.  As the Court reads *U.S. Fidelity & Guaranty Co. v. Federated Rural Electric Insurance Corp.* (the most-recent Oklahoma case cited by Wausau), the precise issue in this suit — namely, whether a breach of the duty to defend causes an insurer to lose contribution rights — was not decided in that case, which related to a dispute between primary and excess carriers over the importance of exhausting the primary carrier's limits.  37 P.3d 828, 830 (Okla. 2001).

In any event, it is likely that a Minnesota court would consider *Cargill* to state the better rule if *Cargill*'s rule differs from the rule in Oklahoma.  Taking all of the choice-influencing factors together — and particularly given that Wausau's argument for choosing Oklahoma law is found in a footnote and unsupported by any reasoning — the Court finds that *Cargill* applies not just to Travelers' contribution claims, but also to Wausau's.

*b.* Cargill *and Contribution*

In *Cargill*, the Minnesota Supreme Court held that an insurer's "breach of a duty to defend precludes application of an equitable right to contribution." 784 N.W.2d at 354.  In remanding the case to the district court, *Cargill* instructed the court, on remand, to "determine whether Liberty Mutual" — the insurer seeking contribution — "breached its duty to defend" the insured.  *Id.*

The Court finds that *Cargill* means what it says:  An insurer that breaches its duty to defend the insured may not later seek contribution for defense costs from another insurer.  Thus, because Wausau and Travelers breached their duty to defend when they declined to defend Land O' Lakes in connection with the 2001 PRP letter, Wausau and Travelers may not now seek contribution for defense costs from White Mountains.

To escape the plain meaning of the language from *Cargill* quoted above, Wausau and Travelers point to the following language that appears in a footnote in *Cargill*:  "[A]n insurer seeking to exercise a right to equitable contribution *may* be precluded from doing so if the insurer breached a duty to defend the insured." 784 N.W.2d at 354 n.15 (emphasis added).  From the use of the word "may" in the quoted phrase, Wausau and Travelers spin a theory that under *Cargill*, only an insurer who breaches the duty to defend *in bad faith* loses contribution rights, whereas an insurer who breaches the duty *in good faith* does not lose contribution rights.  Insurers' Joint Mem. Opp. White Mountains Mot. SJ at 19-20.

There is no support for such a theory in *Cargill*.  Wausau and Travelers make numerous arguments for why a rule that distinguishes between good-faith and bad-faith breaches of the duty to defend would be better than a rule precluding contribution after any breach of the duty to

defend.  Wausau and Travelers may be right, but the Court is obligated to apply Minnesota law

as it exists, and not as the parties would have it.  Whatever the force of Wausau and Travelers'

arguments, the Court cannot disregard the plain language of *Cargill.*

Remember that *Cargill* directed the trial court, on remand, to determine whether the

insurer seeking contribution breached its duty to defend the insured — not whether the insurer

breached that duty in good faith or bad faith.  This instruction would make no sense if the word

"may" in the footnote means what the insurers say it means.  As the Court reads it, the language

in the footnote cited by Wausau and Travelers means the following:  "An insurer seeking to

exercise a right to equitable contribution may be precluded from doing so.  For instance, if the

insurer breached a duty to defend the insured, the insurer is precluded from seeking

contribution."  Only such a reading of the footnoted language is consistent with both *Cargill*'s

direction to the trial court on remand and *Cargill*'s statement in the opinion's body that an

insurer's "breach of a duty to defend precludes application of an equitable right to contribution."

784 N.W.2d at 354.

Finally, the Court notes that even if Wausau and Travelers were potentially liable for

defense costs — and, as a result, a viable dispute existed regarding White Mountains' obligation

to contribute to those defense costs — the Court would not certify a question about *Cargill*'s

meaning to the Minnesota Supreme Court (as Wausau and Travelers request).  Given *Cargill*'s

instruction to the district court on remand, the Court cannot characterize as dicta *Cargill*'s

statement that an insurer's "breach of a duty to defend precludes application of an equitable right

to contribution."  *Id.*  This statement is a holding, and it is sufficiently clear that this Court has no

difficulty discerning or following it, and thus this Court has no reason to certify a question about

*Cargill* to the Minnesota Supreme Court.  Certification may be appropriate when this Court concludes that the law of Minnesota is unsettled, but certification is not appropriate when the parties merely want to try to persuade the Minnesota Supreme Court to change its mind about a clear and recent holding.  *See Shakopee Mdewakanton Sioux Cmty. v. City of Prior Lake*, 771 F.2d 1153, 1157 n.2 (8th Cir. 1985) ("Absent a 'close' question and lack of state sources enabling a nonconjectural determination, a federal court should not avoid its responsibility to determine all issues before it.").

2.  White Mountains' Other Arguments

White Mountains raises several other defenses with respect to the insurers' contribution claim.  Although two of the defenses are flimsy, others would support summary judgment in favor of White Mountains.

One of White Mountains' flimsy defenses is that White Mountains was not licensed to write insurance in Oklahoma and thus none of the policies at issue could have covered the Cushing refinery.  *See* White Mountains Mem. Supp. Mot. SJ at 19-21.  But no one argues that White Mountains wrote any insurance in Oklahoma; rather, Wausau and Travelers argue that White Mountains wrote insurance *in Minnesota* to a corporation headquartered *in Minnesota* and that the insurance covered property owned by that corporation *in Oklahoma*.  Insurers routinely write policies in one state that cover property in another state, so whether White Mountains was licensed to write insurance in Oklahoma is irrelevant.

The second of White Mountains' flimsy defenses is that because Wausau and Travelers do not seek contribution for *indemnity* costs, White Mountains cannot be liable for *defense* costs.  *See* White Mountains Reply Mem. at 1-3 [Docket No. 225].  It is true that, as a general matter, an

insurer is not required to provide a defense for a claim when there is no possibility that the insurer will have to indemnify the insured for the claim. But Wausau and Travelers have not conceded that White Mountains has no indemnity obligation on the underlying claims. Rather, Wausau and Travelers have simply chosen not to pursue contribution for indemnity costs. White Mountains might very well have indemnity obligations on the underlying claims — and thus be liable for defense costs — even though Wausau and Travelers chose to seek contribution only toward defense costs.

White Mountains is on much stronger footing when it argues that the American Farmers and MSC policies at issue did not provide coverage for the Cushing refinery. Specifically, White Mountains argues that the 1945-46 American Farmers policy did not cover operations at *any* premises and thus did not cover the Cushing refinery. White Mountains Mem. Supp. Mot. SJ at 18-19. This appears to be correct.[31]

White Mountains also argues that the Cushing refinery was not among the premises covered under the American Farmers policies for three policy years (1946-47, 1947-48, and 1948-49), *id.* at 15-18, nor among the premises covered under the MSC policies for four policy years (1978, 1979, 1980, and 1981), *id.* at 29-30. White Mountains points out that all of these policies provide "premises-operations" coverage only for premises listed on attached schedules,

---

[31]According to the fragments of the 1945-46 policy in the record, "Premises—Operations" were "excluded from policy." Unger Decl. Ex. 1 [Docket No. 176] at LOL-INS 0002553. Further, the policy had a property-damage limit of $10,000 for "each accident" and $25,000 for "aggregate products," but a limit of $0 for "aggregate operations." *Id.* at LOL-INS 0002556. Finally, an endorsement provides as follows: "In consideration of the premium at which this policy is written, . . . *only products liability* on gasoline, kerosene and fuel oil manufactured or distributed by the insured is covered under this policy." *Id.* at LOL-INS 0002558 (emphasis added).

and that not a single one of the schedules for these policies lists the Cushing refinery as a covered site.  Based on the Court's review of the policies, this also appears to be correct.

In response to White Mountains' arguments that these policies do not cover the Cushing refinery, Wausau and Travelers simply argue that language in each policy's general insuring clause creates an issue of fact over whether the Cushing refinery is covered.  Insurers' Joint Mem. Opp. White Mountains Mot. SJ at 9-10.  Wausau and Travelers' response is beside the point.  White Mountains does not dispute that each policy's insuring grant provides coverage for *something*; but White Mountains says that the schedules show that the *something* that the policies cover does not include the Cushing refinery.  Wausau and Travelers cannot wish away the schedules by saying that the insuring grants, standing alone, do not exclude the possibility that the Cushing refinery was covered.

White Mountains also argues that there is insufficient evidence of the terms of a 1949-50 policy from American Farmers and policies for 1976 and 1977 issued by MSC.  White Mountains Mem. Supp. Mot. SJ at 27-29, 34.  In their briefing, Wausau and Travelers abandoned any claims under a 1949-50 American Farmers policy,[32] but Wausau and Travelers asserted that the existence and terms of the 1976 and 1977 MSC policies can be inferred from evidence that umbrella policies for those periods referred to underlying MSC policies.[33]  Wausau and Travelers

---

[32]Insurers Joint Mem. Opp. White Mountains Mot. SJ at 9 n.7 ("[White Mountains] also asserts that there is no evidence of an American Farmers policy issued for the 1949-1950 policy period.  But even if White Mountains were correct that there is no coverage under [this policy], Insurer Defendants need establish only the potential for coverage under one of White Mountains' other policies to create defense-cost contribution liability.").

[33]Insurers' Joint Mem. Opp. White Mountains Mot. SJ at 9 n.7 ("[T]he 'Schedule of Underlying Insurance' in the MSC umbrella policies for [1976-1977 and 1977-1978] specifically
(continued...)

may be correct about inferring the *existence* of underlying coverage, but they are not correct about inferring the *terms* of that underlying coverage. The Court holds that no reasonable jury could find that the 1976 and 1977 MSC policies covered the Cushing refinery, given that later MSC policies did not do so, and given that those later policies are the only record evidence of the terms of the 1976 and 1977 MSC policies.

Finally, the Court declines to address White Mountains' other arguments, some of which (e.g., arguments about whether damages are for a covered "accident" and whether the owned-property exclusion applies) duplicate arguments made by Wausau and Travelers in connection with Land O' Lakes' claims against them.

In sum, the Court grants summary judgment to White Mountains on three grounds: First, the Court holds that Wausau and Travelers breached their duty to defend Land O' Lakes in 2001, and, under *Cargill*, that breach relieves White Mountains of any duty to contribute to defense costs. Second, the Court holds that, because Wausau and Travelers breached their duty to defend Land O'Lakes in 2001, Land O' Lakes' claim against them for breach of the duty to defend is time barred — and, because Wausau and Travelers cannot be compelled to pay Land O' Lakes' defense costs, White Mountains has nothing to contribute to. And third, the Court holds that no reasonable jury could find that any asserted American Farmers or MSC policy provides coverage for the EPA's claims against Land O' Lakes.

---

[33](...continued)
referenced primary liability policies issued by MSC. . . . Accordingly, there are genuine issues of material fact as to the existence of these MSC primary policies, as well as their terms, conditions[,] and exclusions . . . .").

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS

HEREBY ORDERED THAT:

1.   The motion of plaintiff Land O' Lakes to supplement the summary-judgment

     record [Docket No. 230] is DENIED.

2.   The motion of plaintiff Land O' Lakes for summary judgment [Docket No. 103] is

     DENIED.

3.   The joint motion of defendants Employers Mutual Liability Insurance Company

     of Wisconsin and The Travelers Indemnity Company for summary judgment

     [Docket No. 163] is GRANTED.  Plaintiff's complaint [Docket No. 1 Ex. A] is

     DISMISSED WITH PREJUDICE AND ON THE MERITS.

4.   The motion of third-party defendant White Mountains Reinsurance Company of

     America for summary judgment [Docket No. 169] is GRANTED.

     a.   The third-party complaint of defendant Employers Mutual Liability

          Insurance Company of Wisconsin [Docket No. 40] is DISMISSED WITH

          PREJUDICE AND ON THE MERITS.

b.      The third-party complaint of defendant The Travelers Indemnity Company

[Docket No. 42] is DISMISSED WITH PREJUDICE AND ON THE

MERITS.

LET JUDGMENT BE ENTERED ACCORDINGLY.


Dated:  March  6 , 2012                          s/Patrick J. Schiltz____
                                                 Patrick J. Schiltz
                                                 United States District Judge